OPINION
{¶ 1} Plaintiff-appellant, Lance Boyer, executor of decedent Mary Jane Boyer's ("Mrs. Boyer") estate, appeals from the judgment of the Court of Claims of Ohio denying plaintiff's motion for judgment notwithstanding the verdict ("JNOV") and motion for a new trial. The trial court ruled in favor of defendants-appellees, The Ohio State University Medical Center and James Cancer Hospital. For the reasons that follow, we affirm the judgment of the trial court. *Page 2 
 {¶ 2} In January 2002, Mrs. Boyer was diagnosed with granulocytic sarcoma ("GS"), which is a rare form of cancer. Mrs. Boyer underwent chemotherapy and radiation for the condition. After the chemotherapy and radiation, the cancer was in remission. Mrs. Boyer's treating physicians recommended that she undergo a stem cell transplant ("SCT") to further treat the condition. On May 29, 2002, Mrs. Boyer was admitted at defendants' hospital to begin the preparative regimen for the SCT. The SCT was begun on June 6, 2002. On June 15, 2002, Mrs. Boyer suffered a respiratory event and was placed on a ventilator. On June 19, 2002, Mrs. Boyer was taken off the ventilator and she died.
 {¶ 3} In August 2003, plaintiff filed a medical malpractice lawsuit against defendants in the Court of Claims as a result of Mrs. Boyer's death at defendants' hospital. A connected action was filed in the Franklin County Court of Common Pleas. Consequently, in October 2003, the Court of Claims stayed the action pending final disposition of the connected action. In February 2006, the Court of Claims, having been informed that the connected action was no longer pending, filed an entry vacating the stay of proceedings. After the order of stay was vacated, plaintiff, with leave of court, filed an amended complaint, which alleged wrongful death, medical negligence, lack of informed consent, and loss of consortium.
 {¶ 4} The issues of liability and damages were bifurcated for trial, and the issue of liability was tried to the court on March 26, 27, and 29, 2007. At trial, the following evidence was presented.
 {¶ 5} Plaintiff testified that the treating physicians told Mrs. Boyer that she had leukemia and that an SCT was the most prudent course of action considering the *Page 3 
circumstances. Plaintiff stated that the treating physicians informed Mrs. Boyer that she had a "blood tumor" that was confined to a specific area, and that they did not explain the difference between acute myelogenous leukemia ("AML") and GS. Plaintiff acknowledged that Mrs. Boyer had read the consent form for the SCT and that a physician had explained to plaintiff and Mrs. Boyer the risks of the SCT, which included infection and death. Jennifer Summerville-Boyer, the decedent's daughter, testified that her mother was being treated for AML.
 {¶ 6} Belinda Avalos, M.D., testified that she is board-certified in internal medicine, hematology, and oncology, and that she has performed hundreds to thousands of SCTs during her career. Dr. Avalos testified that during an SCT, the patient's bone marrow is completely obliterated by chemotherapy and/or radiation, and then the patient is given healthy cells. She testified that the ideal time to perform an SCT for a patient with cancer is when the cancer is in remission, which is when the cancer is undetectable.
 {¶ 7} Dr. Avalos testified that Mrs. Boyer's admitting diagnosis on May 29, 2002, was GS. She testified that GS is a tumor comprised of malignant myeloid cells, and that it occurs outside the bone marrow. She stated that a myeloid cell is a cell that gives rise to white blood cells, red blood cells, and platelets, and that AML also involves the myeloid cell. She characterized GS as a very rare disease. She testified that due to the high likelihood of GS transforming to AML, patients with GS are treated as though they have AML, and if a patient with GS develops AML, the survival rate is very poor.
 {¶ 8} Dr. Avalos opined to a reasonable degree of medical certainty that the medical records from May 29, 30, and 31, 2002, did not show that Mrs. Boyer was suffering from either an active infection or sepsis. She recognized that Mrs. Boyer's *Page 4 
temperature on May 31, 2002 had spiked to 101.1 degrees Fahrenheit. She testified that Mrs. Boyer's increase in temperature on May 31, 2002, could have been a side effect of her chemotherapy. She testified that typically in the transplant setting sepsis is due to a gram-negative organism. She stated that MRSA, which is a gram-positive organism, can colonize without causing infection, and that it is commonly found on the skin of patients in the hospital. She also explained that a urine culture can become contaminated with MRSA if that person has MRSA on his or her skin. She testified that there was an absence of bacteria in the blood cultures taken from Mrs. Boyer on May 31, 2002. When confronted with the death certificate, which indicates an onset of sepsis two weeks prior to Mrs. Boyer's death, Dr. Avalos testified that patients are not septic for two weeks. "[Y]ou either respond to antibiotic therapy or you don't." (Tr. 115.) Dr. Avalos opined that Mrs. Boyer was septic at the time of her death.
 {¶ 9} Thomas Lin, M.D., testified that he is licensed to practice medicine in Ohio and is board-certified in hematology and oncology. Dr. Lin performs SCTs and has a faculty appointment at Ohio State. He testified that weekly committee meetings were held in 2002 at the hospital to discuss issues concerning all leukemia patients and all bone marrow transplant patients. He explained that GS and AML are both cancers of the "granulocytic cell line" (Tr. 253), and when the disease is only found outside the bone marrow it is considered GS. He testified that GS is a variance of AML, and that Mrs. Boyer did not have AML. He stated that GS without evidence of AML is a very rare condition, and patients with GS typically develop AML within one or two years. He testified that the treatment for a patient with GS is the same for a patient with AML, and that the long-term prognosis for patients with GS is believed to be poorer than patients *Page 5 
with AML. He testified that the survival rate is better for a patient with AML when the SCT is performed during the first remission of cancer than during a second remission. He testified that he believed that Mrs. Boyer's chances of survival without the SCT, and just chemotherapy and radiation, were very low. He stated that he discussed with Mrs. Boyer the risks associated with SCT, and that he explained the medical condition she had in relation to the treatment. Dr. Lin opined to a reasonable degree of medical certainty that Mrs. Boyer's condition was life-threatening, that it was within the standard of care to recommend an SCT for her, and that the consent form was appropriate for the procedure.
 {¶ 10} Richard M. Stone, M.D., testified that he is licensed to practice medicine in the state of Massachusetts and that he is board-certified in internal medicine, oncology, and hematology. Dr. Stone testified that he is on the faculty at Harvard Medical School and is the clinical director of the adult leukemia program at Dana-Farber Cancer Institute in Boston, Massachusetts. He described GS as a rare disease involving "leukemic cells that exist outside the bone marrow in a clump." (Tr. 325-326.) He testified that GS cells are the same cells as found with AML. He stated that the more official term for GS is "extramedullary leukemia," meaning that the leukemic cells are found outside the bone marrow. (Tr. 325.) He opined that it is very likely that GS will develop into AML.
 {¶ 11} Dr. Stone testified that the three treatment options that were available for Mrs. Boyer when her cancer was in remission were observation, more chemotherapy, and an SCT. Based upon his review of the medical records, Dr. Stone opined that it was appropriate and within the standard of care to recommend the SCT for Mrs. Boyer. He also opined that based upon his review of the medical records, Mrs. Boyer was adequately informed of the risks, benefits, and alternative treatments of an SCT. He *Page 6 
further opined that the consent form signed by Mrs. Boyer was appropriate for her treatment and that it accurately stated that she had a life-threatening disease of the blood-forming and immune system. All of Dr. Stone's opinions were to a reasonable degree of medical certainty.
 {¶ 12} Edward Copelan, M.D., testified that he is licensed to practice medicine in the state of Ohio, and that he is board-certified in internal medicine, hematology, and oncology. In 2002, Dr. Copelan was employed by Ohio State and was the director of its bone marrow transplant program. He testified that he has performed hundreds of SCTs and published many articles on the procedure. He stated that GS involves myeloid stem cells that originate outside the bone marrow, and AML involves the same stem cells but occurs in the bone marrow. He testified that on April 26, 2002, he discussed the risks and benefits of an SCT with plaintiff and Mrs. Boyer. He stated that aside from an SCT, the other two treatment options available were more chemotherapy and no additional treatment. He testified that Mrs. Boyer did not have AML. Dr. Copelan opined to a reasonable degree of medical certainty that the decision to perform an SCT was within the standard of care.
 {¶ 13} Plaintiff's expert, Arthur J. Weiss, M.D., testified that he is board-certified in oncology and internal medicine and is licensed to practice medicine in the state of Maine. Dr. Weiss testified that he began performing bone marrow transplants in 1960. He explained that a person with leukemia has cancer cells in his or her blood and/or bone marrow. He defined GS as a localized collection of cells found outside the bone marrow that resemble the cancer cells found in a leukemia patient. He testified that "[t]hey're not leukemic cells. They're abnormal cells that histologically look like leukemic cells but they *Page 7 
have not been proven to be leukemic cells." (Tr. 206.) He testified that Mrs. Boyer was diagnosed with GS, and he opined that Mrs. Boyer did not have AML. He testified that, at the time Mrs. Boyer underwent the SCT, there was no evidence that she had any cancer cells remaining in her body or that she had any life-threatening disease of the blood-forming and immune system. Dr. Weiss opined to a reasonable degree of medical certainty that the consent form signed by Mrs. Boyer was appropriate for treatment of AML but not GS, and that the recommendation that Mrs. Boyer undergo the SCT was not within the standard of care.
 {¶ 14} Carol Osborn, the associate director of medical information management at The Ohio State University, testified that she is responsible for data quality compliance and coding. Ms. Osborn testified that she uses the International Classification of Diseases, Ninth Edition, to classify diseases. She and her staff review the medical records in order to identify diagnoses, and then they assign code numbers to the diagnoses after the patient is discharged. She testified that, based on her review of the records, she reached the conclusion that Mrs. Boyer's principal diagnosis, or the reason for her admission on May 29, 2002, was the GS.
 {¶ 15} Mrs. Boyer's death certificate lists acute respiratory distress syndrome as the immediate cause of death. The certificate also lists other conditions that led to Mrs. Boyer's death, including sepsis and SCT. These conditions are listed sequentially, with the most recent condition listed first.
 {¶ 16} On June 8, 2007, the trial court issued a decision regarding the merits of plaintiff's claims against defendants. The court found that plaintiff had failed to prove any of his claims by a preponderance of the evidence and therefore rendered judgment in *Page 8 
favor of defendants. Subsequently, plaintiff filed a motion for JNOV pursuant to Civ. R. 50(B), or, in the alternative, a motion for reconsideration, as well as a motion for a new trial pursuant to Civ. R. 59. On August 8, 2007, the trial court denied these motions. In its August 8, 2007 entry, the trial court noted that Civ. R. 50(B) is only applicable to cases tried by a jury, and in this case plaintiff was not entitled to a jury trial. On that basis, the trial court denied the motion for JNOV. Additionally, the trial court noted that it had already reviewed the evidence at trial and passed upon the credibility of the evidence, as demonstrated by its ten-page written decision filed June 8, 2007. The trial court was unconvinced that its prior decision was in error and denied the motion for a new trial.
 {¶ 17} Plaintiff appeals and sets forth the following assignments of error for our review:
 Assignment of Error #1
 After the civil trial, the trial court commits prejudicial error when it denies plaintiff's motion for judgment notwithstanding the verdict when a prima facie case for negligence has been presented and the evidence points so strongly in the movant's favor; therefore the judgment of the trial court must be reversed.
 Assignment of Error #2
 After a civil trial, the trial court commits prejudicial error when it denies Plaintiff's motion for judgment notwithstanding the verdict when the Plaintiff has proved Mrs. Boyer was incorrectly diagnosed with AML; therefore the judgment of the trial court must be reversed.
 Assignment of Error #3
 After a civil trial, the trial court commits prejudicial error when it denies Plaintiff's motion for judgment notwithstanding the verdict when the circumstantial evidence of physical facts is so conclusive as to rebut testimony presenting a different *Page 9 
version that Mrs. Boyer was misdiagnosed with AML; therefore the judgment of the trial court must be reversed.
 Assignment of Error #4
 A civil trial court commits prejudicial error when it denies Plaintiff's motion for judgment notwithstanding the verdict when a prima facie case for lack of informed consent has been presented; therefore the judgment of the trial court must be reversed.
 Assignment of Error #5
 A civil trial court commits prejudicial error when it denies Plaintiff's motion for a new trial where the judgment is not sustained by the weight of the evidence; therefore the judgment of the trial court must be reversed.
 Assignment of Error #6
 A civil trial court commits prejudicial error when it denies Plaintiff's motion for a new trial based when the evidence supports the misdiagnosis of AML; therefore the judgment of the trial court must be reversed.
 Assignment of Error #7
 A civil trial court commits prejudicial error when it denies Plaintiff's motion for a new trial when the weight of the evidence supports Plaintiff's claim of negligence in regard to decedent's prior infection prior to the stem cell transplant; therefore the judgment of the trial court must be reversed.
 Assignment of Error #8
 A civil trial court commits prejudicial error when it denies Plaintiff's motion for a new trial when the weight of the evidence supports Plaintiff's claim of lack of informed consent; therefore the judgment of the trial court must be reversed.
 Assignment of Error #9
 A civil trial court commits prejudicial error when it denies Plaintiff's motion for a new trial based on the misconduct by the prevailing party; specifically the false testimony given by *Page 10 
Defendant's witnesses; therefore the Court's judgment must be reversed.
 {¶ 18} Plaintiff's first four assignments of error allege that the trial court erred in denying his motion for JNOV. Under Civ. R. 50(B), a party may move for a JNOV not later than 14 days after the entry of judgment. However, this rule is inapplicable in bench trials. InFreeman v. Wilkinson (1992), 65 Ohio St.3d 307, the Supreme Court of Ohio explained: "Civ. R. 50(B) governs motions for judgment notwithstanding the verdict; however, as the term `verdict' implies, it only applies in cases tried by jury." Id. at 309. See, also, Brooks v.Lady Foot Locker, Summit App. No. 22297, 2005-Ohio-2394, at ¶ 61 (noting that "[a] motion for judgment notwithstanding the verdict can only be made regarding claims that the jury returned a verdict on.") In this case, plaintiff was not entitled to a jury trial, and the matter was tried to the court. See R.C. 2743.11 ("No claimant in the court of claims shall be entitled to have his civil action against the state determined by a trial by jury.") Therefore, the trial court properly denied plaintiff's motion for JNOV pursuant to Civ. R. 50(B).
 {¶ 19} Plaintiff's remaining assignments of error allege that the trial court erred in denying his motion for a new trial pursuant to Civ. R. 59(A), which provides, in pertinent part, as follows:
 A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:
 * * *
 (2) Misconduct of the jury or prevailing party;
 * * * *Page 11 
 (6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;
 * * *
 On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and enter a new judgment.
 {¶ 20} In his motion for a new trial, plaintiff cited Civ. R. 59(A)(2) and (6) as grounds for a new trial. Relying upon Civ. R. 59(A)(2), plaintiff argued that he was entitled to a new trial because witnesses for defendants falsely testified. Relying upon Civ. R. 59(A)(6), plaintiff argued that the judgment was not sustained by the weight of the evidence.
 {¶ 21} Regarding a motion for a new trial on the basis that a witness gave false testimony, it has been stated that "the losing party must establish that false testimony occurred and that it is probable the adverse verdict is based on this false testimony." Ward-Sugar v.Collins, Cuyahoga App. No. 87546, 2006-Ohio-5589, at ¶ 4. As noted above, there was no jury verdict in this case; the matter was tried to the court. Thus, plaintiff's motion for a new trial essentially was a request for the trial court, as the trier of fact, to reassess its factual determinations in view of his allegation that there was false testimony given at trial.
 {¶ 22} Plaintiff claims that Dr. Avalos falsely testified that there was no evidence of infection in Mrs. Boyer's medical record. Plaintiff also asserts that the trial court "allowed Dr. Avalos to testify under oath that a death certificate cannot be relied on, MRSA is not a serious infection, and Defendant's medical records, specifically her admitting diagnosis of *Page 12 
AML were incorrect." (Plaintiff's brief, at 31.) Plaintiff also claims that Ms. Osborn falsely testified. According to plaintiff, Ms. Osborn "was recalled specifically to negate her earlier testimony that Mrs. Boyer's admission diagnosis was for AML." (Plaintiff's brief, at 31.) Plaintiff claims that Ms. Osborn was recalled "to testify that the code was invalid and placed into the decedent's medical record after the fact." Id.
 {¶ 23} Plaintiff's arguments in support of his contention that defendants' witnesses falsely testified are largely based on mischaracterizations of the testimony of Dr. Avalos and Ms. Osborn. Upon our review of the record, we find as unpersuasive plaintiff's claim that the trial court erred in not granting his motion for a new trial on the basis that defendants' witnesses testified falsely.
 {¶ 24} We next address plaintiff's arguments concerning the weight of the evidence. In Stackhouse v. Logangate Property Mgt., Mahoning App. No. 06 MA 124, 2007-Ohio-3171, at ¶ 35, the Seventh District Court of Appeals noted the following: "The trial court, when considering a motion for new trial on the manifest weight of the evidence, has a duty to review the evidence submitted at the trial and to pass upon the credibility of the witnesses and the evidence. * * * However, such rule deals with a trial court reviewing a jury verdict. When a trial court reviews its own judgment in the case of a bench trial, weight-of-the-evidence reversal is nearly unheard of."
 {¶ 25} Although plaintiff framed his assignments of error in terms of the trial court's decision to overrule his motions for JNOV and for a new trial, he essentially argues in this appeal that the trial court's decision finding that plaintiff had failed to prove any of his claims by a preponderance of the evidence is against the manifest weight of the evidence. Therefore, in the interest of justice, we will determine whether the trial court's *Page 13 
June 8, 2007 decision, finding in favor of defendants on the issue of liability, was against the manifest weight of the evidence.
 {¶ 26} Civil "[judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, syllabus. "[A]n appellate court should not substitute its judgment for that of the trial court when there exists * * * competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial judge." Seasons Coal Co., Inc. v.Cleveland (1984), 10 Ohio St.3d 77, 80; see, also, Myers v. Garson
(1993), 66 Ohio St.3d 610, 616 (reaffirming the reasoning of SeasonsCoal, and "hold[ing] that an appellate court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial court").
 {¶ 27} When considering whether a civil judgment is against the manifest weight of the evidence, an appellate court is guided by a presumption that the findings of the trier of fact were correct.Seasons Coal Co., at 79-80. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Id. at 80.
 {¶ 28} In this appeal, plaintiff challenges the trial court's determinations as to his claims of medical negligence and lack of informed consent. We first address plaintiff's medical negligence claim. In order to establish medical malpractice, a plaintiff must *Page 14 
show: (1) the standard of care recognized by the medical community, (2) the failure of the defendant to meet the requisite standard of care, and (3) a direct causal connection between the medically negligent act and the injury sustained. Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, 130. Ordinarily, the appropriate standard of care must be demonstrated by expert testimony. See id. at 130. That expert testimony must explain what a physician of ordinary skill, care, and diligence in the same medical specialty would do in similar circumstances. Id.
 {¶ 29} As to his medical negligence claim, plaintiff asserts that the evidence established that performing an SCT to treat GS is not within the standard of care recognized by the medical community, and that defendants' failure to meet the standard of care was the proximate cause of Mrs. Boyer's death. Plaintiff also argues that the facts presented at trial prove that the SCT should not have been performed because Mrs. Boyer was suffering from an infection prior to her SCT. Lastly, plaintiff argues that Mrs. Boyer was incorrectly diagnosed with AML.
 {¶ 30} Plaintiff correctly asserts that Dr. Weiss testified to a reasonable degree of medical certainty that recommending an SCT for Mrs. Boyer was not within the appropriate standard of care. However, Drs. Lin, Copelan, and Stone all testified to a reasonable degree of medical certainty that recommending an SCT for Mrs. Boyer was within the appropriate standard of care.
 {¶ 31} According to plaintiff, the medical record shows that Mrs. Boyer was infected with MRSA on May 31, 2002. The discharge summary in the medical records states that a urine culture from May 31, 2002, was known to be positive for MRSA for which Mrs. Boyer was given vancomycin. Dr. Avalos explained that MRSA is commonly *Page 15 
found on the skin of hospital patients, and a urine culture can become contaminated with MRSA because it is a bacteria that typically lives on skin. Additionally, Dr. Avalos recognized that Mrs. Boyer's temperature spiked to 101.1 degrees Fahrenheit on May 31, 2002, and she testified that an increase in temperature can be a side effect of chemotherapy. Dr. Avalos testified to a reasonable degree of medical certainty that as of May 31, 2002, Mrs. Boyer was not septic and did not have an active infection. Dr. Stone explained that a urine culture that is positive for MRSA does not mean that the patient has an infection. He stated, "There's a difference between an infection and a positive culture. Infection is a clinical diagnosis." (Tr. 364.) Furthermore, although plaintiff correctly notes that Dr. Stone testified that he was "sure sepsis played a role in [Mrs. Boyer's] demise" (Tr. 372), he did not testify that Mrs. Boyer was septic before the SCT.
 {¶ 32} Plaintiff alleges that the death certificate conclusively proves that Mrs. Boyer had sepsis before the SCT, which occurred on June 6, 2002. Plaintiff reasons that Mrs. Boyer had sepsis before the SCT because the certificate states that the sepsis began two weeks before her death on June 19, 2002. Exactly two weeks before June 19, 2002, would have been June 5, 2002. We find this argument unpersuasive.
 {¶ 33} The death certificate instructs the person completing the certificate to sequentially list, under the immediate cause of death, any conditions leading to the immediate cause of death. Concerning the conditions that led to Mrs. Boyer's death, acute respiratory distress syndrome is listed first, as the immediate cause of death, with a stated onset of 24 hours before death; sepsis is listed next, with a stated onset of two weeks before death; SCT is listed next, also with a stated onset of two weeks before death; and GS is listed last, with a stated onset of six months before death. *Page 16 
 {¶ 34} Applying plaintiff's interpretation of the death certificate, the certificate indicates that the SCT occurred exactly two weeks before Mrs. Boyer's death, on June 5, 2002. But medical records show that the actual SCT occurred on June 6, 2002. In view of this disparity, the intervals expressed on the death certificate indicating the time between the onset of the condition or circumstance and death could reasonably be viewed as an estimate using the most appropriate measurement of time. Furthermore, based on how the conditions were listed, the sepsis onset could be viewed as a more recent occurrence than the SCT because it was listed above the SCT. Thus, to the extent plaintiff argues that the death certificate conclusively proves that Mrs. Boyer had sepsis before the SCT, we find that argument unpersuasive.
 {¶ 35} Plaintiff contends that it was error for the trial court to find that he failed to prove that Mrs. Boyer was diagnosed with AML. Relying upon a hospital admission sheet concerning Mrs. Boyer, plaintiff asserts that Mrs. Boyer's admitting diagnosis code was for AML. The trial court determined that the medical records demonstrated that Mrs. Boyer was diagnosed with and treated for GS throughout her time at the hospital. Additionally, the trial court cited plaintiff's expert, Dr. Weiss, as admitting that Mrs. Boyer's medical records show that she was diagnosed with GS. Lastly, the trial court noted that Ms. Osborn testified that the coding of medical records by her and her staff does not occur until after the patient is discharged. We find that the evidence cited by the trial court supported its determination that plaintiff failed to prove that Mrs. Boyer was diagnosed with AML. *Page 17 
 {¶ 36} Based on the foregoing, we resolve that the trial court's finding that plaintiff failed to prove his medical negligence claim is supported by competent, credible evidence.
 {¶ 37} We now address plaintiff's argument that the trial court erred in finding that he did not prove his lack of informed consent claim. The elements of the tort of lack of informed consent were set forth by the Supreme Court of Ohio in Nickell v. Gonzalez (1985), 17 Ohio St.3d 136, at the syllabus:
The tort of lack of informed consent is established when:
 (a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;
 (b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and
 (c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy.
 {¶ 38} Plaintiff does not challenge the fact that the record demonstrates that Mrs. Boyer was informed of the risks and benefits associated with the SCT procedure. However, plaintiff asserts that even though Mrs. Boyer was informed of the risks of an SCT for a patient with AML, she was not informed of the risks of an SCT for a patient with GS. In connection with this argument, plaintiff contends that Mrs. Boyer was misinformed as to her condition when she consented to the SCT. Plaintiff reasons that Mrs. Boyer was not properly informed that her diagnosis was GS, not AML, and as a result of that misinformation she could not provide informed consent for the SCT. These arguments *Page 18 
are unavailing, as there is no indication in the record that the risks associated with an SCT for a patient with AML would be materially different than the risks for a patient with GS. Moreover, Dr. Lin's testimony indicated that Mrs. Boyer was fully informed regarding the nature of her condition.
 {¶ 39} Plaintiff also contends that Mrs. Boyer was not informed that if she did not have the SCT her mortality rate was zero. Plaintiff's contention seems to assume that without the SCT the chances of Mrs. Boyer dying as a result of the GS were zero. Based on that assumption, plaintiff reasons that a reasonable person would not have agreed to the SCT procedure in view of this information. Apparently, plaintiff is relying upon Dr. Copelan's statement that "[i]f the [GS] would never develop into anything else, then [the mortality rate] would be zero." (Defendant's Exhibit G1, at 36.) However, Dr. Copelan's testimony, as well as the testimonies of Drs. Avalos, Lin, and Stone, indicated that there was a high probability that Mrs. Boyer would have developed AML. Other testimony at trial indicated that when AML occurs after GS, the chances of survival are low.
 {¶ 40} Considering the foregoing, we conclude that the trial court's finding that plaintiff failed to prove his claim of lack of informed consent was not against the manifest weight of the evidence.
 {¶ 41} Based on the foregoing, we overrule all nine of plaintiff's assignments of error. Accordingly, we affirm the judgment of the Court of Claims of Ohio.
Judgment affirmed.
 BRYANT and BROWN, JJ., concur. *Page 1