[Cite as *Aztec Internatl. Foods, Inc. v. Duenas*, 2013-Ohio-450.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

AZTEC INTERNATIONAL FOODS, INC.,   :
et al.,

                                :      CASE NO.   CA2012-01-002

      Plaintiffs-Appellees,

                                :       O P I N I O N
                                        2/11/2013

   - vs -                         :

                                :

OCTAVIO DUENAS, et al.,

                                :

      Defendants-Appellants.       :

CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2007-CVH-1091

Barry F. Fagel, 312 Walnut Street, Suite 2300, Cincinnati, Ohio 45202, for plaintiffs-appellees

Peter A. Saba, Patrick R. Veith, 2623 Erie Avenue, P.O. Box 8804, Cincinnati, Ohio 45208, for plaintiffs-appellees

Robert F. Croskery, 810 Sycamore Street, 2nd Floor, Cincinnati, Ohio 45202, for defendants-appellants, Octavio Duenas and Ramon Michel

Gary R. Lewis, Cincinnati Club Building, 30 Garfield Place, Suite 915, Cincinnati, Ohio 45202, for defendant, FJO, Inc., dba Los Cabos Mexican Restaurant

**HENDRICKSON, J.**

{¶ 1} Defendants-appellants, Octavio Duenas and Ramon Michel (Michel), appeal

from a modified judgment of the Clermont County Court of Common Pleas in which the trial

court awarded plaintiff-appellee, Ricardo Ruano, compensatory and punitive damages after

finding he had been defrauded by Michel. Duenas and Michel also appeal the trial court's decision to enter judgment in favor of Ruano on their counterclaim for a constructive trust. For the reasons discussed below, we affirm the trial court's decision.

## I. FACTUAL BACKGROUND

{¶ 2} The history of this case is complex and dates back to the formation of Aztec International Foods, Inc. (Aztec).[1] In 2003, Aztec was formed for the purpose of operating a Mexican restaurant in Amelia, Ohio.[2] Aztec is an Indiana corporation licensed to transact business in Ohio under the registered trade name "Los Cabos Mexican Restaurant" (Los Cabos). Ruano, his uncle Duenas, and the corporation RFJ, Inc. – which was comprised of Ruano's cousin Michel and Michel's brothers Jose Michel (Jose) and Francisco Michel (Francisco) – all contributed assets to the formation of Los Cabos. The amount of money each party was contributing to the restaurant, the various roles each party was to play in the development and operation of the restaurant, and the ownership interests each party was to hold in the corporation were never formally agreed upon in writing and were often subject to change. Furthermore, as the trial court noted, "none of the parties involved in the formation of Aztec and its operation of Los Cabos had any firm idea what they were doing. None displayed any effort to comply with the formalities required of corporate entities, and instead apparently relied upon a series of informal transactions and agreements." Consequently, legal ownership of Aztec differed significantly from what the parties envisioned and disputes over the parties' informal transactions and agreements ultimately led to the present lawsuit.

---

1. This case is further complicated by the fact that the case spanned the terms of three separate trial court judges, all of whom made significant rulings impacting the status of case. Judge Robert P. Ringland determined legal ownership of Aztec, Judge W. Kenneth Zuck determined the merits of the parties' various claims following a bench trial, and Judge Richard P. Ferenc determined the merits of Duenas and Michel's Motion for a New Trial.

2. Aztec was originally formed in February 2001 by Duenas for the purpose of operating grocery stores throughout Indiana. At the time of Aztec's incorporation in 2001, Duenas was its sole director, officer, and shareholder, owning 100 shares of stock. In 2003, the purpose behind Aztec's formation was amended to permit the operation of Los Cabos in Amelia, Ohio.

## A. Parties' Ownership Understanding

{¶ 3}   Early in 2003, Ruano, Duenas, and Michel discussed opening a Mexican restaurant.  It was initially agreed that each individual would be an equal one-third owner, and they would each invest equally in the business.  Although Ruano had worked in restaurants throughout his life, he had never owned a Mexican restaurant before Los Cabos.  Conversely, Michel and his brothers had opened and operated numerous restaurants through their corporation RFJ, Inc.  Michel was therefore able to use connections and assets acquired through RFJ to help open Los Cabos.

{¶ 4}   Ruano, who lived in Los Angeles, sold his condominium and used the proceeds of the sale to invest in Los Cabos.  Ruano initially sent $10,000 to Michel to show his commitment to setting up the restaurant, and, in June 2003, he later invested another $70,000.  The amount of money Duenas and Michel invested in the corporation was never specifically established.  Nonetheless, sometime in 2003, Ruano was informed by Duenas and Michel that Michel's brothers, Jose and Francisco, wanted to be involved in the creation of the restaurant. Ownership interests were no longer going to be shared equally between the three parties.  Rather, Michel and his brothers, through their corporation RFJ, were to own 50 percent of the corporation and Duenas and Ruano were each going to have 25 percent ownership interests in Aztec.  Then, in December 2003, around the time Los Cabos opened for business, a final ownership interest adjustment occurred.  Ruano's ownership interest was decreased to 20 percent, RFJ's ownership interest remained at 50 percent, and Duenas's interest was increased to 30 percent.

{¶ 5}   In June 2003, a few months prior to the final ownership interest adjustment, Duenas executed a promissory note in the amount of $70,000, payable to Ruano. The terms of the promissory note required Duenas to make 120 payments in the amount of $659.89 to Ruano, and included an acceleration clause that permitted Ruano to accelerate payment of

the full principle sum and accrued interest if Duenas failed to make a payment. No payments were ever made under the terms of this note. Ruano testified at trial that he had been presented with the promissory note by Duenas at Duenas's accountant's office. In Ruano's own words, "My understanding of this promissory note was that [Duenas] was giving me the promissory note to make me feel that I had nothing to worry about when it came to the - - the share of the business. He presented the document to me telling me that this was - - is going to - - to protect me - - from any wrongdoings basically."

{¶ 6} The same month the promissory note was executed, Duenas applied for a liquor license for Los Cabos. In an affidavit, Duenas attested that he had "received a personal loan from my nephew * * * Ricardo Ruano, for my own use in starting Los Cabos Restaurant. * * * [T]his loan is a personal, family loan, and does not confer any stock ownership or monetary interest in Los Cabos Restaurant on the holder of the loan, Ricardo Ruano. * * * Ricardo Ruano does not have any interest whatsoever in the business for which we are soliciting a liquor permit."

{¶ 7} Los Cabos was fully equipped and operational by December 2003. Invoices for the equipment installed in Los Cabos, totaling over $145,000, were billed to RFJ by U.S. Foodservice, Inc. Although Los Cabos made an initial payment of $20,000 to U.S. Foodservice, the majority of the equipment was paid for by RFJ through a rebate program Michel had established with U.S. Foodservice. Kevin Lindenmeyer, the U.S. Foodservice account representative for Los Cabos, explained that Michel had used U.S. Foodservice to open a number of restaurants prior to Los Cabos.[3] According to Lindenmeyer, for each food purchase one of the previously opened restaurants made, 3.1 percent of the purchase would be rebated and the money applied to pay down the outstanding amount on Los Cabos's

---

3. The record does not clarify whether Michel had personally opened these other restaurants or whether the restaurants had been opened by RFJ or another corporation Michel had an ownership interest in.

equipment purchase. As a result of this rebate program, Los Cabos's equipment was paid in full within two years.

{¶ 8} The restaurant operated without issue for nearly three years. Then, on May 1, 2006, Duenas executed an assignment of 70 percent of his shares in Aztec to Ruano in exchange for Ruano's forgiveness of the June 2003 promissory note.

{¶ 9} Around the same time Duenas executed the assignment of his shares, Ruano and Michel made arrangements for Ruano to purchase Michel's "interest" in Aztec. Michel wanted reimbursement for the equipment that was put into Los Cabos. Michel represented that he had personally paid for the equipment, and he sought to recover $125,000 from Ruano for his investment in Aztec. On May 2, 2006, Ruano wired $75,000 to Michel as partial payment of the $125,000. Ruano never made the second payment of $50,000 to Michel. Ruano testified at trial he did not make the second payment as he had discovered that Michel had misrepresented his role in obtaining the equipment for Los Cabos. Specifically, Ruano testified that he learned that Michel had never personally invested any money in Aztec and that the equipment utilized in Los Cabos had been provided through RFJ's rebates, and not by Michel personally. Ruano, therefore, filed suit, seeking to recover the $75,000 he believed he had been defrauded out of by Michel.

## B. Legal Ownership

{¶ 10} Despite the parties discussions and informal agreements regarding their intentions of shared ownership in Aztec, legal ownership of Aztec was determined by the trial court on July 31, 2008, to be as follows. When Aztec was first incorporated, Duenas, as its sole shareholder, owned 100 shares of common stock. Duenas retained ownership of all stock until he executed an assignment of 70 percent of his share in Aztec's stock to Ruano in exchange for forgiveness of the June 2003 promissory note. Pursuant to the terms of the assignment, Ruano became the assignee and holder of 70 shares of Aztec's stock on April

30, 2006.[4] Duenas retained ownership of the remaining 30 shares of Aztec's stock. At no time did Michel or RFJ receive an assignment of stock from Duenas or Ruano, and, as such, neither Michel nor RFJ ever had an ownership interest in Aztec.

## II. PROCEDURAL HISTORY

{¶ 11} In June 2007, Ruano and Aztec filed suit against Duenas, Michel, and FJO, Inc., a corporation formed by Francisco, Jose, and Duenas that had opened a second restaurant operating under the name of Los Cabos Mexican Restaurant.[5] On January 18, 2008, while the litigation was pending, Ruano individually, and on behalf of Aztec, entered into a settlement agreement releasing claims against defendant FJO, Inc. (FJO release) and non-party RFJ, Inc. (RFJ release). At the time the release was executed Michel was no longer an officer of RFJ. In fact, Michel testified that at the time he received the $75,000 payment from Ruano on May 2, 2006, he was no longer a part of RFJ.

{¶ 12} Shortly after Ruano and Aztec filed suit, Duenas and Michel moved to disqualify plaintiffs' counsel. This ultimately led to a decision by the trial court determining legal ownership of Aztec at the time the lawsuit was initiated. As set forth above, the trial court determined that Duenas owned 30 shares of Aztec's stock, Ruano owned 70 shares of Aztec's stock, and Michel did not own any shares of Aztec's stock.

{¶ 13} After the trial court determined the parties' stock ownership interests, Ruano filed an amended complaint, asserting claims against Duenas and Michel for defamation, tortious interference with his business relationship with Aztec, and civil conspiracy. Ruano further asserted claims against Michel for fraud and unjust enrichment. Ruano sought both punitive damages and compensatory damages. Duenas and Michel filed counterclaims

---

4. Although the assignment was executed on May 1, 2006, the terms of the assignment called for an effective date of April 30, 2006.

5. Neither plaintiff Aztec International Foods, Inc. nor defendant FJO, Inc. are parties to the present appeal. All claims involving these two parties were resolved prior to trial.

against Ruano, alleging that Ruano converted their money and property, breached a contract with them, and breached fiduciary duties owed to them. Duenas and Michel also sought an accounting of the corporation's activities since its inception and a declaratory judgment as to the parties' respective ownership interests in Aztec. Specifically, Duenas and Michel sought to have judgment of ownership in Aztec established as Duenas owning 30 percent, Michel owning 50 percent, and Ruano owning 20 percent. Alternatively, if the trial court refused to amend its July 31, 2008 decision determining ownership of Aztec, and Ruano was found to have legal title to 70 percent of the corporation, Duenas and Michel sought "a ruling that Ruano holds 25 percent of the corporation's shares in constructive trust for * * * Michel, who has equitable title to such shares."

{¶ 14} In September 2010, Ruano moved for partial summary judgment on Duenas and Michel's counterclaims. The trial court granted Ruano's motion on the conversion claim and breach of fiduciary duties claim. A bench trial was held in November 2010 on the parties remaining claims. During the course of the bench trial, Duenas and Michel voluntarily withdrew their accounting claim. At the close of Ruano's evidence, the trial court granted Duenas and Michel's "motion for a directed verdict" on Ruano's claims for defamation, tortious interference with his business relationship with Aztec, and civil conspiracy.[6] The trial court also stated that it was dismissing all claims against Duenas as he was subject to the release signed by Ruano and FJO. The trial court indicated that the fraud claim and unjust enrichment claim against Michel remained viable as it was a "personal

---

6. We note that although Duenas and Michel moved for a "directed verdict" on Ruano's claims, procedurally they should have requested dismissal pursuant to Civ.R. 41. In a bench trial, "a motion for judgment by a defendant at the close of plaintiff's case is one for dismissal, pursuant to Civ.R. 41(B)(2), and not for a directed verdict, pursuant to Civ.R. 50(A)(4)." *Law-Bren, Inc. v. New Horizon Builders, Inc.*, 12th Dist. No. CA98-07-052, 1999 WL 126070 at *1 (Feb. 22, 1999). However, "[t]he moving party is not prejudiced if the trial court erroneously applies the Civ.R. 50(A) standard for a directed verdict because it is much more rigorous than the standard for a dismissal under Civ.R. 41(B)(2). Satisfaction of the Civ.R. 50(A) standard implies satisfaction of the Civ.R. 41(B)(2) standard." *First Natl. Bank of Cincinnati v. Cianelli*, 73 Ohio App.3d 781, 788-789 (12th Dist.1991).

matter outside of any business involving the corporation."

{¶ 15} The trial continued with Duenas and Michel presenting a defense to Ruano's claims, as well as evidence in support of their remaining counterclaims for breach of contract and the establishment of a constructive trust. Following the close of Duenas and Michel's evidence, Ruano moved to dismiss their claims, and the trial court granted Ruano's motion. Closing arguments were then held on Ruano's remaining claims of fraud and unjust enrichment.

{¶ 16} On November 22, 2010, the trial court entered judgment in favor of Ruano. The trial court specifically resolved all issues of credibility in favor of Ruano and found "clear and convincing evidence, that [Duenas and Michel] set out on a plan to deceive and defraud Ricardo Ruano and to take advantage of his lack of knowledge about the means and methods of capitalizing and organizing a Corporation that has the purpose of operating a restaurant." The trial court entered judgment in the amount of $75,000 against Michel on Ruano's claims for fraud and unjust enrichment. The trial court, apparently having forgotten that it had dismissed all claims against Duenas, also entered judgment in the amount of $75,000 against Duenas on Ruano's claim for civil conspiracy. The court further awarded punitive damages against Duenas and Michel in the amount of $150,000, and ordered them to pay court costs in the amount of $22,573.95 and Ruano's attorney fees in the amount of $99,918.

{¶ 17} On March 14, 2011, Duenas and Michel filed a motion for new trial, or in the alternative, for judgment notwithstanding the verdict.[7] In their motion, Duenas and Michel argued, among other things, that the trial court erred in allowing Ruano to pursue a fraud

---

7. We note that when matters are tried to the bench, and not to a jury, Civ.R. 50(B), which sets forth the process for moving for judgment notwithstanding the verdict, is inapplicable. *See Boyer v. Ohio State University Medical Center*, 10th Dist. No. 07AP-742, 2008-Ohio-2278, ¶ 18; *Freeman v. Wilkinson*, 65 Ohio St.3d 307, 309 (1992). Rather, the proper procedural method is to request a new trial pursuant to Civ.R. 59(A). *Boyer* at ¶ 18.

claim when the fraud claim had not been pleaded with particularity, and the trial court erred in denying their claim for a constructive trust. They further argued the trial court committed irregularity by finding Duenas had conspired with Michel to commit the fraud, in contravention of the trial court's oral decision to dismiss all claims against Duenas.

{¶ 18} On August 2, 2011, the trial court issued a decision on Duenas and Michel's motion for new trial. The trial court determined judgment against Michel on the claims of fraud and unjust enrichment was proper, but determined that judgment entered against Duenas was improper given the court's pronouncement that Duenas was subject to the release executed between Ruano and FJO. The court, therefore, vacated the judgment entered against Duenas, including both the compensatory damage and punitive damage awards, and ordered that judgment be granted in Duenas's favor on all of Ruano's claims. The court further determined that judgment in favor of Ruano was proper on all of Duenas and Michel's counterclaims, including the claim for a constructive trust. The court adjusted Ruano's damage award, holding Michel liable for $75,000 in compensatory damages on the fraud and unjust enrichment claims, and ordering him to pay punitive damages in the amount of $36,500.[8] The court further ordered Michel to pay $99,918 in attorney's fees and $22,573.95 for court costs.

{¶ 19} Duenas and Michel appeal the trial court's decision on their motion for new trial, asking this court to hold that the trial court erred by finding (1) Ruano was permitted to recover damages on a fraud claim he failed to plead with particularity, (2) clear and convincing evidence to support Ruano's fraud claim, (3) the release executed by Ruano and RFJ did not release Michel individually, and (4) insufficient evidence to establish a

---

8. The amount of punitive damages awarded to Ruano was reduced following a hearing before the trial court on December 15, 2011. At this time, the court determined Michel's net worth on May 2, 2006, the date the parties stipulated the tort was committed, was $365,000.

constructive trust for the benefit of Michel.

### III. ANALYSIS

{¶ 20} Assignment of Error No. 1:

{¶ 21} THE TRIAL COURT ERRED, TO THE DETRIMENT OF THE DEFENDANT[S]-APPELLANTS, BY SUSTAINING A VERDICT AGAINST DEFENDANT MICHEL, OVER DEFENDANT'S [sic] CONTINUING OBJECTIONS, WHEN FRAUD HAD NOT BEEN PLEADED WITH SUFFICIENT PARTICULARITY.

{¶ 22} In their first assignment of error, Duenas and Michel argue the trial court erred by allowing Ruano to pursue a fraud claim that was not pleaded with particularity as required by Civ.R. 9. Duenas and Michel contend that Ruano's original fraud claim asserted that Michel sold "phantom stock" to Ruano, but this claim "morphed" at trial into a new, separate fraud claim revolving around the money Ruano paid Michel for the equipment placed in Los Cabos. Under this "morphed" fraud claim, Ruano sought to recover $75,000 paid to Michel in reliance on Michel's misrepresentation that he had an interest in Los Cabos because he personally paid for the equipment being utilized in the restaurant. Duenas and Michel dispute that they impliedly consented to litigation of this "morphed" fraud claim.

{¶ 23} Duenas and Michel are correct in their contention that the factual narrative contained in Ruano's amended complaint did not specifically assert facts relating to Ruano's expenditure of funds for the reimbursement or purchase of Los Cabos's equipment from Michel. Rather, Ruano's amended complaint alleged the following in regards to the fraud claim:

> (8) Michel has never owned Aztec's stock, yet has continued to represent to Ruano that he owns fifty percent (50%) of Aztec's stock.
>
> (9) Through fraud and deceit, Michel persuaded Ruano to pay Michel seventy five thousand dollars ($75,000) for "phantom" stock in Aztec that Michel did not own.

- 10 -

* * *

(31) Michel, despite his knowledge that he did not own Aztec's stock, represented to Ruano that he owned good title to fifty percent (50%) of Aztec's stock; all as part of Michel's scheme to defraud Ruano and in an effort to convince Ruano to purchase "phantom" stock from Michel.

(32) Michel's representations to Ruano were material to the transaction of Ruano purchasing the "phantom" stock from Michel.

(33) Michel's claimed ownership of Aztec's stock was made falsely to Ruano and with the intent of misleading Ruano into relying upon it.

(34) Ruano justifiably relied upon Michel's representations and Ruano paid Michel seventy five thousand dollars ($75,000) for Michel's "phantom" stock.

(35) As a result of Michel's fraud, Ruano suffered damages in an amount to be determined at trial but in excess of seventy five thousand dollars ($75,000).

{¶ 24} Civ.R. 9(B) requires the circumstances constituting fraud to be pled with particularity. "These circumstances normally include the time, place, and content of the false representation, the fact misrepresented, and what was obtained or given as a consequence of the fraud." *Turner v. Salvagnini America, Inc.*, 12th Dist. No. CA2007-09-233, 2008-Ohio-3596, ¶ 26. Such particularity is required to both apprise the opposing party of the act which is the subject of the fraud claim and to allow the opposing party to prepare an effective defense. *Id.*

{¶ 25} Civ.R. 9(B), however, must be read in conjunction with Civ.R. 15(B), which "treats issues that were not raised in the pleadings as if they were so raised, as long as they were tried with the express or implied consent of the parties and substantial prejudice will not arise as a result." *McCartney v. Universal Electric Power Corp.*, 9th Dist. No. 21643, 2004-Ohio-959, ¶ 7, citing *State ex rel. Evans v. Bainbridge Twp. Trustees*, 5 Ohio St.3d 41 (1983), paragraph one of the syllabus. *See also Textiles, Inc. v. Design Wise, Inc.*, 12th Dist. Nos.

- 11 -

CA2009-08-015, CA2009-08-018, 2010-Ohio-1524, ¶ 16-18. A trial court should consider various factors in determining whether the parties impliedly consented to litigate an issue, including: "whether they recognized that an unpleaded issue entered the case; whether the opposing party had a fair opportunity to address the tendered issue or would offer additional evidence if the case were to be tried on a different theory; and whether the witnesses were subjected to extensive cross-examination on the issue." *Evans* at paragraph one of the syllabus. "Whether an unpleaded issue is tried by implied consent is to be determined by the trial court, whose finding will not be disturbed, absent an abuse of discretion." *Id.* at paragraph three of the syllabus.

{¶ 26} In the present case, the trial court found that Duenas and Michel had impliedly consented to the litigation of Ruano's "morphed" fraud claim. In making this finding, the trial court relied on "the combination of the Defendants' recognition of this potential claim [as early as July 2007] as well as their failure to object to the introduction of the evidence [at trial] regarding this 'morphed' claim." After reviewing the record, we find that the trial court did not abuse its discretion by finding Duenas and Michel had impliedly consented to the litigation of Ruano's "morphed" fraud claim.

{¶ 27} The record indicates that Duenas and Michel were aware of the "morphed" fraud claim as early as July 10, 2007, when the issue was raised during the deposition of Julie Myers. Myers, a certified public account whose clients included Aztec, Duenas, and Michel, was questioned by both plaintiff's attorney and defendants' attorney about Aztec's stock ownership and Michel's claim that he was owed $125,000 for equipment placed in Los Cabos.

{¶ 28} Additional discovery regarding Michel's investment into Los Cabos continued until the time of trial. During the deposition of Kevin Lindenmeyer in July 2010, the issues of the cost of the equipment placed into Los Cabos as well as whether that equipment had been

paid for personally by Michel or by the corporation RFJ were expressly addressed by both plaintiff's attorney and defendants' attorney.

{¶ 29} Furthermore, not only does the record indicate that Duenas and Michel were well aware that Ruano's fraud claim had "morphed" prior to trial, but it also indicates they were given a fair opportunity to address the issue and cross-examine witnesses on the matter at trial. In his opening statement, Ruano's attorney set out the basis of the fraud claim, asserting that Michel made false representations that he personally paid for the equipment.[9] Ruano's attorney proceeded to call Michel, as if on cross-examination, as his first witness. As the trial court noted:

> [t]he crux of this initial cross-examination centered around [Ruano's] claim that Mr. Michel had misrepresented his personal financial contributions regarding * * * Los Cabos to [Ruano]. More specifically, [Ruano] claimed that he agreed to pay Ramon Michel the total figure of $125,000 because Michel repeatedly represented to him that this was the amount of his [Michel's] personal financial investment in the venture which yielded Los Cabos.

The record reveals that at no time during Ruano's cross-examination of Michel about his

---

9. In his opening statement, Ruano's attorney made the following statements with regard to the fraud claim:

> The evidence will show that in this case and throughout the progress of this corporation operating, misrepresentations and misstatements were made by Ramon Michel to Ricardo Ruano stating, I put all of this equipment in here. I put $125,000 worth of equipment in here. I put cash and money into this business.
>
> * * *
>
> We finally find out, no. It's really RFJ that's put the money in. RFJ is really the one that put the equipment in. RFJ is the other entity that was investing in this.
>
> * * *
>
> Contrary to [Michel's] representations, he never put the equipment in. Contrary to his representations, he never put a dime in. And that evidence will come out, Your Honor. That evidence will come out in testimony that [Michel] didn't contribute any money to this contrary to his representations. He didn't put this equipment in contrary to his representations.

investment into Los Cabos or the representations he made about the equipment placed in Los Cabos did Duenas and Michel's attorney object to this line of questioning. Likewise, during Ruano's direct examination, Duenas and Michel's counsel did not object to Ruano's testimony about Michel's representations regarding Los Cabos's equipment on the basis that it involved evidence outside the scope of matters pleaded in Ruano's fraud claim. In fact, Duenas and Michel's attorney extensively cross-examined Ruano about the equipment placed in Los Cabos and Ruano's payment of $75,000 to Michel:

> Q: * * * Did you ever tell Ramon [Michel] you can't use your interest in your corporation [RFJ, Inc.] to do your investment in the restaurant?
>
> A: No.
>
> Q: All right. And I'm trying to understand why in the world it would matter to you whether or not Ramon [Michel] put money in himself or whether or not he had his restaurant - - or his corporation put money in as long as the money got in there.
>
> * * *
>
> Q: * * * [Y]ou agreed to pay $125,000 to Ramon [Michel] based on his interest in the corporation, correct?
>
> A: Based on what I believe[d] that he had invested in the business.
>
> Q: Right. You - - you agreed to pay him, because you believed that it was fair that Ramon [Michel] be reimbursed for what he had brought to the table, right?
>
> A: In terms of equipment, yes.
>
> Q: All right. So the only thing that really changed is that you discovered that Ramon [Michel] instead of personally writing a check for $125,000 had actually gotten his corporation - - the corporation owned by him and two brothers to put in $125,000 of equipment, true?
>
> A: Not true.
>
> Q: Well, what was the other difference?

A: What do you mean by what's the other difference?

Q: I just asked you the only thing that changed that I - - that I can tell of any significance is when you - - it - - it - - it's the beginning of 2006, you know that Ramon [Michel] doesn't own any shares technically of Aztec International, but you do know that there's $125,000 worth of equipment there, roughly - - furniture, tables, kitchen equipment, and so forth - - and you know that you didn't pay for it. So the only that thing that really happens is you found out that Ramon [Michel] used his influence or used his dealings with RFJ to put that equipment in, correct?

A: Yes.

Q: Now, from your standpoint, you haven't been disadvantaged at all, because if you own 70 percent of Los Cabos it still has that $125,000 worth of equipment, right?

A: Looks like that.

Q: All right. So to you what - - why do you care whether or not Ramon Michel wrote a check out of his own bank account or had his corporation put the $125,000 of equipment in? Doesn't really matter to you, does it?

A: It does matter to me.

Q: Okay. Explain why.

A: Because he claimed he purchased equipment that he didn't.

* * *

Q: What was - - what kept you from paying - - what - - what - - what kept you from paying Ramon [Michel] the $50,000; the last $50,000 that you had agreed to pay him? It was a discovery of the fact that Ramon Michel didn't personally put money into it; isn't that what you told this Court?

A: I did not pay Ramon [Michel] because he didn't pay for the equipment.

Q: Exactly. You're testifying that you didn't pay Ramon [Michel] because you discovered that it was his companies that paid for the equipment and not Ramon [Michel], correct.

A: I didn't pay Ramon [Michel] because I discovered that he did not pay for the equipment.

Q: All right. And you would have paid the $50,000 to Ramon [Michel] if he had in fact personally paid for the equipment?

A: I believe so.

{¶ 30} Duenas and Michel argue that their examination of Ruano and other witnesses regarding the purchase of Los Cabos's equipment through a rebate program was done to procure evidence in support of their counterclaim for a constructive trust. They argue "[t]he fact that the issue of Michel's use of company [RFJ, Inc.] rebates to make part of his investment in the business came up at trial is not 'consent to try fraud' on the issue, because there was another legitimate reason for the issue to be discussed." While Duenas and Michel were certainly entitled to question Michel, Ruano, and other witnesses about the purchase of Los Cabos's equipment, and the entity or individuals responsible for payment of the equipment, in an effort to present evidence in support of their counterclaim, they cannot claim ignorance that such questioning would be relevant to the fraud claim set forth by Ruano in his counsel's opening statement.

{¶ 31} Given that all parties were aware of the existence of the "morphed" fraud claim as early as 2007 and Duenas and Michel had the fair opportunity to address the issue and extensively cross-examine witnesses, we cannot say that the trial court abused its discretion in finding that Duenas and Michel impliedly consented to the litigation of Ruano's "morphed" fraud claim. Under the facts of this case, substantial prejudice did not arise from litigation of the new fraud claim. Duenas and Michel's first assignment of error is therefore overruled.

{¶ 32} Assignment of Error No. 2:

{¶ 33} THE TRIAL COURT ERRED, TO THE DETRIMENT OF THE DEFENDANT[S]-APPELLANTS, OVER DEFENDANTS' OBJECTIONS, BY SUSTAINING A VERDICT IN FAVOR OF * * * [RUANO] WHEN THERE WAS NOT CLEAR AND CONVINCING EVIDENCE SUPPORTING A FINDING OF FRAUD, AS THE FACTS DID NOT SHOW AN

- 16 -

INTENTIONALLY FALSE STATEMENT OF MATERIAL FACT, JUSTIFIABLE RELIANCE, AND DAMAGES.

{¶ 34} In their second assignment of error, Duenas and Michel contend that the trial court erred by finding clear and convincing evidence that Michel defrauded Ruano out of $75,000.[10] Essentially, Duenas and Michel assert that the trial court's judgment was against the manifest weight of the evidence as Ruano failed to prove that Michel made an intentionally false statement of material fact and that Ruano justifiably relied on this representation to his detriment.

{¶ 35} When evaluating whether a judgment is against the manifest weight of the evidence in a civil case, the standard of review is the same as in the criminal context. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 17. "[W]e weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the finder of fact 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Marinich v. Lumpkin*, 12th Dist. No. CA2011-11-124, 2012-Ohio-4526, ¶ 20, quoting *Eastley* at ¶ 20. In weighing the evidence, we are mindful of the presumption in favor of the finder of fact. *Eastley* at ¶ 21. "A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence

---

10. In entering judgment in favor of Ruano on his fraud claim, the trial court found "evidence that far exceeds clear and convincing evidence, that * * * Ramon Michel * * * set out on a plan to deceive and defraud Ricardo Ruano * * *." Although the trial court found clear and convincing evidence of fraud, Ruano only needed to prove his fraud claim by a preponderance of the evidence as he was not seeking a reformation or rescission of a contract but rather compensatory and punitive damages resulting from Michel's alleged fraudulent misrepresentations. *See Household Finance Corp. v. Altenberg*, 5 Ohio St.2d 190, syllabus (1966) ("In an action for equitable relief based on fraud, such as to set aside or reform a written document, clear and convincing evidence of the fraud is required, but, in an ordinary action at law for money only based on fraud, a preponderance of the evidence is sufficient to prove fraud"). As the trial court applied a higher burden of proof than was necessary, we find the trial court's use of the incorrect burden of proof to be harmless error. *See, e.g., In re Stark*, 2d Dist. No. 1646, 2005-Ohio-1912, ¶ 16.

submitted before the trial court." *Seasons Coal Co., Inc.* v. *Cleveland*, 10 Ohio St.3d 77, 81 (1984).

{¶ 36} A claim for fraud requires proof of the following elements:

(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, ¶ 47. "A fact is material if it is likely, under the circumstances, to affect the conduct of a reasonable person with reference to the transaction." *Leal v. Holtyogt*, 123 Ohio App.3d 51, 76 (2d Dist.1998).

{¶ 37} At the outset, we note that Ruano's fraud claim developed from statements Michel made in or about May 2006 regarding his desire to be reimbursed for the equipment that was put into Los Cabos. It is Michel's representations that he was entitled to recover $125,000 for his personal investment in Los Cabos's equipment that gave rise to Ruano's fraud claim, not the representations Michel may have made in 2003 regarding the parties' various ownership interests in Aztec.[11] From the record, it is clear that in 2003 none of the parties had a clear understanding of the amount of money each party was contributing to the development of the restaurant or where the money would originate.[12]

---

11. The dissent makes numerous references to the parties' understanding of events as they existed in 2003. As discussed above, the time frame relevant to Ruano's fraud claim is May 2006.

12. During cross-examination, Ruano testified as follows regarding Michel's investment into Los Cabos:

Q: Mr. Ruano, isn't it true that Ramon Michel never told you how he was making his investment into Los Cabos?

A: He said he was paying for it.

Q: Well, I know he said – you said he said he was paying for it, but he didn't tell you how he was doing it, right?

{¶ 38} However, by May 2006, Los Cabos had been fully developed and had been operating for nearly three years. At this time, the parties' investments had already occurred and the equipment being utilized in the restaurant had been paid in full. From the record it is apparent that Michel had knowledge of who had paid for the equipment placed in Los Cabos, as well as the method of such payments, and yet he made a false statement of material fact regarding his purchase of the equipment.

{¶ 39} Ruano testified that in 2006, Michel represented "many times" that *he* had put about $140,000 of equipment into Los Cabos. According to Ruano, Michel said, "oh, I put in the equipment myself. * * * I paid for the equipment, it's mine, I hold title to it." Michel's own testimony demonstrates that he represented that he personally paid to have the equipment placed in Los Cabos although he knew RFJ had paid for the equipment:

> Q: So these assets that we talk about [the equipment], we can agree that RFJ put those in? * * *
>
> * * *
>
> Q: And you'd agree with me that Exhibit 2 is a cumulation [sic] of invoices with respect to equipment that was purchased for the Los Cabos restaurant; is that correct?
>
> A: Yes.

---

A: Right.

Q: Didn't tell you, for example, if he was using stock; didn't tell you he was selling a condo, correct?

A: That's correct.

Q: And he never told you he was only using his direct personal funds out of his own checking account, correct?:

A: I understood he was paying for it; how – what way, I don't know.

Q: Yeah. You may have understood that he was paying for it, but he didn't tell you and you didn't ask whether he was using his direct personal funds or using some other asset he had, correct?

A: Correct.

Q: Okay. And those were paid with credits of RFJ; is that correct?

A: Credits and rebates.

Q: Okay. Now, despite the fact that RFJ was putting these assets in, RFJ was putting this money in, like you said the representation you were making to Ricardo [Ruano] was, I'm putting this money in. I'm putting this equipment in; isn't that right? That's the way you would represent it; isn't that right?

A: It's always been like that.

Q: You always represented that?

A: Always it is.

Q: You always told him, even though it was RFJ that put this in, you kept representing, I put this money in? I put this equipment in; isn't that right?

A: My corporation did.

Q: That was it, even though it was - - you would say you did though, wouldn't you?

A: Okay.

Q: Isn't that right?

A: Yeah, I - -

Q: Let's be clear. That's what you would say?

A: Yes

Q: Even though that wasn't true? Even though it was the corporation that put it in - -

A: Uh-huh.

Q: - - you would represent that you personally put it in; isn't that right?

A: Yes.

{¶ 40} Although Duenas and Michel, and the dissent to a certain extent, believe that it is immaterial whether Michel personally paid for the equipment or whether RFJ paid for the

equipment, Ruano's testimony demonstrates otherwise. Ruano testified at trial that the reason he "cared" about whether it was Michel or RFJ who had paid to have the equipment put into the restaurant was because he wanted to make sure he was buying the equipment "appropriately" and "paying off" the party who had invested in the equipment. Ruano's testimony that he relied on Michel's representation in deciding to transfer the $75,000 to Michel is evidence that Michel's representation was material to the transaction. Further, Ruano's explanation that the reason he refused to pay Michel the remaining $50,000 was because he discovered "somewhere around late 2006, early 2007 that RFJ, not Michel, had paid for the equipment is also evidence that Michel's representations of ownership in the equipment were material to the transaction.[13] Ruano specifically testified:

> A: I did not pay Ramon [Michel] because he didn't pay for the equipment.
>
> Q: Exactly. You're testifying that you didn't pay Ramon [Michel] because you discovered that it was his companies that paid for the equipment and not Ramon [Michel], correct?
>
> A: I didn't pay Ramon [Michel] because I discovered that he did not pay for the equipment.
>
> Q: All right. And you would have paid the $50,000 to Ramon [Michel] if he had in fact personally paid for the equipment, is that your testimony?
>
> A: I believe so.

{¶ 41} Duenas and Michel contend that even if Michel did misrepresent his role in obtaining the equipment for Los Cabos, there is no evidence demonstrating that he intended

---

13. As noted by the dissent, at one point in his trial testimony Ruano states that it was "during the course of litigation" that he found out that Los Cabos's equipment had been purchased by RFJ, not Michel. However, Ruano makes other references to finding out that RFJ had paid for the equipment well before the lawsuit was initiated in June 2007, stating that he discovered "somewhere around late 2006, early 2007" that Michel had not personally paid for the equipment. Based upon the trial court's decision entering judgment in favor of Ruano on the fraud claim, it is apparent that the trial court chose to believe Ruano's testimony that he found out about Michel's misrepresentation prior to the start of litigation. The evidence contained in the record supports the trial court's finding.

to mislead Ruano. Michel argues that he used a similar rebate program to establish past restaurants and "believed that he was legitimately bringing the kitchen equipment to the table." Michel also believed he was entitled to reimbursement or payment from Ruano because he had invested his time, knowledge, staff and menu concepts into Los Cabos.

{¶ 42} "In proving a fraud claim, a person's intent to mislead another into relying on a misrepresentation or concealment of a material fact generally must be inferred from the totality of the circumstances since a person's intent is rarely provable by direct evidence." *Fairbanks Mobile Wash, Inc. v. Hubbell*, 12th Dist. Nos. CA2007-05-062, CA2007-05-068, 2009-Ohio-558, ¶ 22.

{¶ 43} Although Michel contends that he did not intend to mislead Ruano because he "legitimately" believed he was entitled to payment for his services in obtaining the equipment, the record demonstrates that at the time Ruano agreed to pay Michel $125,000 Ruano believed that Michel had personally paid for the equipment because that is what Michel represented.[14] Michel's statements to Ruano were false and misleading. Michel, as a partial owner of RFJ, knew that the equipment had been paid for through the rebate program and, further, that this rebate program had been utilized by RFJ, not himself. Regardless of whether Michel had used a rebate program in the past to purchase items for restaurants he personally opened and owned, the record reflects that in this instance, RFJ, not Michel, was responsible for payment of the equipment, and RFJ, not Michel, used the rebate program to pay off the equipment. This distinction is of importance as Michel was not the sole shareholder of RFJ. Michel and his two brothers, Francisco and Jose, all owned an equal one-third interest in RFJ. Michel, therefore, cannot lay sole claim to all of RFJ's assets.

---

14. It is interesting that Michel contends he "legitimately" believed he was entitled to payment for his services in obtaining the kitchen equipment, yet he never submitted an invoice for his services to Ruano.

{¶ 44} Further, the record indicates that Michel had never personally contributed any money or assets to the creation of Los Cabos. Michel testified that he never personally put money into Los Cabos, and the menu and concepts being utilized by Los Cabos were provided by RFJ. Michel explained that he was compensated for his time and effort in helping to get Los Cabos up and running by RFJ. According to Michel, he earned $10,000 from RFJ for work related to Los Cabos. While the dissent finds the $10,000 figure paid by RFJ to Michel "grossly insufficient consideration" given Michel's efforts in helping to make the restaurant operational, we note that we are not being called upon to determine whether RFJ has adequately compensated Michel for his efforts. If Michel felt he was not sufficiently compensated for his efforts, his remedy was to seek further remuneration from RFJ. Certainly, the supposed lack of consideration received by Michel in no way permits or warrants his fraudulent conduct towards Ruano.

{¶ 45} Given the foregoing circumstances, we find there was sufficient evidence for the trial court to infer that Michel intended to mislead Ruano into paying for equipment for which Michel knew he had not personally paid.

{¶ 46} Duenas and Michel also contend that the trial court's determination that Ruano justifiably relied on Michel's representation that he personally paid for the equipment placed in Los Cabos was against the manifest weight of the evidence. They argue that Ruano could not have justifiably relied on Michel's statements before making the initial $75,000 payment for the equipment as "evidence that the equipment was paid for by rebates appeared on every invoice that Ruano saw and could have been reviewed before he tried to buy [Michel's] share in the company." They argue that Ruano, as the manager of Los Cabos, had access to the restaurant's books and records and therefore could have verified how the equipment was paid for before wiring Michel the $75,000.

**{¶ 47}** "The question of justifiable reliance is one of fact and requires an inquiry into the relationship between the parties." *Crown Property Dev., Inc. v. Omega Oil Co.*, 113 Ohio App.3d 647, 657 (12th Dist.1996). "The factors a court should consider include the nature of the transaction, the materiality of the representation or fact concealed, the parties' relationship, and their respective intelligence, experience, age, mental and physical condition, knowledge, and means of knowledge." *Hubbell*, 2009-Ohio-558 at ¶ 26. "Reliance is justified if the representation does not appear unreasonable on its face and if, under the circumstances, there is no apparent reason to doubt the veracity of the representation." *Crown Property Dev., Inc.* at 657.

**{¶ 48}** The totality of the circumstances in this case demonstrates that Ruano had no apparent reason to doubt the veracity of Michel's representations regarding his purchase of the Los Cabos equipment. The record reflects that all the parties in this case were related, and they relied heavily on this familial bond in the negotiation, creation, and operation of Los Cabos. Ruano testified that although he had worked in Mexican restaurants in the past, he had never owned or opened a restaurant before Los Cabos. As such, he depended on his cousin Michel's knowledge and experience in opening restaurants, and he trusted Michel to handle important matters like selecting a location for the restaurant, negotiating a favorable lease, and having the correct equipment placed in the restaurant. It was not unreasonable for Ruano to believe Michel's representation that he had personally paid for the equipment when Ruano himself did not have a role in obtaining the equipment for the restaurant.

**{¶ 49}** Further, it was not unreasonable for Ruano to agree to pay Michel $125,000 for the equipment without first verifying that Michel personally paid for the equipment by looking at the restaurant's books. Although Ruano, as manager of Los Cabos, presumably had access to the books and records, there is no evidence that the books would have clarified how payment was made to U.S. Foodservice or who specifically had paid the equipment bill.

Though the invoices were billed to "RFJ, Inc., attention Ramon Michel," the invoices do not mention the rebate program, do not detail how past payments were made, and do not clarify what person or entity had submitted past payments for the equipment.

{¶ 50} Given Ruano's inexperience in opening restaurants, Michel's experience in opening restaurants, and the parties' trusting familial relationship, we cannot say that the trial court clearly lost its way in determining that Ruano justifiably relied on Michel's statement that he personally paid for Los Cabos's equipment.

{¶ 51} Finally, Duenas and Michel contend that Ruano has "suffered no damages whatsoever from his payment of $75,000 as it is undisputed that * * * Michel added value far in excess of $125,000 through his actions." They argue that Ruano has received an "extreme advantage" as he owns 70 percent of Aztec and has full use of Los Cabos's equipment without having paid for such. They also argue that it is irrelevant that Michel would have to indemnify Ruano if RFJ sought a "replenishment" of the money for the equipment.

{¶ 52} At trial, Ruano testified that he had not paid RFJ for the kitchen equipment and RFJ had not made a claim on the equipment. Nonetheless, the evidence presented at trial establishes that Ruano was damaged in the amount of $75,000 as he paid Michel personally for the equipment when Michel had no legal claim or entitlement to such money. Michel testified that at the time he received the $75,000 from Ruano, he was no longer a shareholder in RFJ. Further, Michel testified he had not transferred any portion of the $75,000 to RFJ or to Francisco or Jose. The fact that RFJ has yet to seek reimbursement for its investment in Los Cabos does not mean that Michel is entitled to keep the funds Ruano spent in an effort to pay the proper owner of the equipment. RFJ's failure to make a claim on the equipment does not forgive Michel for fraudulently obtaining money from Ruano under false pretenses. The fact remains that Ruano was defrauded out of $75,000.

{¶ 53} In light of the foregoing, the trial court clearly did not lose its way and create such a manifest miscarriage of justice that the judgment must be reversed. While the dissent spends considerable effort vouching for Michel's beliefs with regard to ownership of RFJ's investments, claiming it was "reasonable" under the circumstances for Michel to believe that the corporation's investments were his own, personal investments, it is apparent that the trial court did not find Michel's belief to be "reasonable." We will not disturb the trial court's factual findings. *See Wilkerson v. Wilkerson*, 12th Dist. Nos. CA2004-02-043, CA2004-02-046, 2005-Ohio-1236, ¶ 20. In reviewing credibility determinations made by the trial court or the weight given by the trial court to evidence produced at trial, we are mindful of the presumption in favor of the finder of fact. *See Eastley v. Volkman*, 2012-Ohio-2179 at ¶ 21. Where "evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Id.*, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d at 80. "[E]very reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *Id.* Given the testimony and evidence presented at trial, it was within the trial court's province, sitting as the trier of fact, to resolve conflicts in the evidence and issues of credibility in Ruano's favor. This court will not second-guess the trial court in evaluating the evidence and assessing the credibility of the witnesses.

{¶ 54} Duenas and Michel's second assignment of error is, therefore, overruled.

{¶ 55} Assignment of Error No. 3:

{¶ 56} THE TRIAL COURT ERRED, TO THE DETRIMENT OF THE DEFENDANT-APPELLANT, RAMON MICHEL, BY REFUSING TO APPLY THE LANGUAGE OF A RELEASE THAT RELEASED [RUANO'S] CLAIMS AGAINST HIM.

{¶ 57} In his third assignment of error, Michel argues the trial court erred in refusing to find that the release executed by Ruano in favor of RFJ did not release Ruano's claims against him. Michel contends he is a "predecessor" officer of RFJ and, as such, subject to the RFJ release. Ruano, however, contends that the RFJ release did not release "predecessor" officers of RFJ, and, even if it did, the release would only apply to claims arising out of corporate activities, not to those claims he brought against Michel personally for fraud and unjust enrichment. Ruano further argues that the FJO release did not release his claims against Duenas, and Ruano attempts to raise the following assignment of error:

{¶ 58} Ruano's Assignment of Error No. 1:

{¶ 59} THE TRIAL COURT ERRED IN FINDING THAT THE LANGUAGE IN THE FJO, INC. RELEASE APPLIED TO OCTAVIO DUENAS.

{¶ 60} As an initial matter, we find that we need not consider Ruano's assignment of error as he failed to comply with the requirements of App.R. 3. Pursuant to this rule, "[a] person who intends to defend a judgment or order against an appeal taken by an appellant and *who also seeks to change the judgment or order * * ** shall file a notice of cross appeal within the time allowed by App.R. 4." (Emphasis added.) App.R. 3(C)(1). Ruano clearly seeks to change the court's ruling regarding the applicability of the FJO release to his claims against Duenas, yet he failed to file a cross-appeal as required by App.R. 3(C). *See In re Benner*, 12th Dist. No. CA95-03-041, 1996 WL 12878 at *3 (Jan. 16, 1996); *In re Orecchio*, 7th Dist. No. 09 JE 37, 2010-Ohio-2849, ¶ 36-38. Accordingly, we find that Ruano's asserted assignment of error is not properly before this court, and we will therefore not entertain his argument that the FJO release did not apply to Duenas.[15]

---

15. At oral argument, Ruano argued for the first time that he was attempting to bring his assignment of error pursuant to R.C. 2505.22, which provides that "[i]n connection with an appeal of a final order, judgment, or decree of a court, assignments of error may be filed by an appellee who does not appeal, which assignments shall be passed upon by a reviewing court before the final order, judgment, or decree is reversed in whole or in part." Ruano's assignment of error is not raised in an attempt to defend the trial court's decision. *See* App.R.

{¶ 61} Turning now to Michel's assignment of error, we note that "[i]t is axiomatic that a settlement agreement is a contract designed to terminate a claim by preventing or ending litigation and that such agreements are valid and enforceable by either party." *Continental W. Condominium Unit Owners Assn. v. Howard E. Ferguson, Inc.*, 74 Ohio St.3d 501, 502 (1996). The construction of a written contract is a question of law, which we review de novo. *In re All Kelly & Ferraro Asbestos Cases*, 104 Ohio St.3d 605, 2004-Ohio-7104, ¶ 28.

{¶ 62} "In construing the terms of a written contract, the primary objective is to give effect to the intent of the parties, which we presume rests in the language that they have chosen to employ." *Id.* at ¶ 29. Where the terms of the contract are clear and unambiguous, a court need not go beyond the plain language of the agreement to determine the rights and obligations of the parties. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53 (1989). Additionally, "[w]here possible, a court must construe the agreement to give effect to every provision in the agreement." *In re All Kelly & Ferraro Asbestos Cases*, 2004-Ohio-7104 at ¶ 29.

{¶ 63} In the present case, the settlement agreement executed by Ruano specifically states that the agreement was entered into between (i) Aztec, (ii) Ruano, (iii) Jose, (iv) FJO, Inc., (v) Jalisciense's, Inc.,[16] and (vi) RFJ, Inc. (collectively referred to as the "parties") for the purposes of "fully and finally settl[ing] and resolv[ing] any and all claims, injuries, rights, interests, damages, suits, actions, causes of action, liabilities, asserted and unasserted, known and unknown and/or controversies which may exist between them arising out of the Action [Clermont County Court of Common Pleas Case No. 2007 CV 01091]."

{¶ 64} The parties agreed to enter into releases, divided into two separate sections,

---

3(C)(2). Rather, Ruano seeks to reverse the trial court's decision that the FJO release applied to Duenas, and, as such, this particular assignment of error needed to be raised in compliance with App.R. 3(C)(1).

16. Jalisciense's, Inc. is an Indiana corporation.

one entitled "Release by Aztec and Ruano" and one entitled "Release by FJO, [Jose] Michel,

Jalisciense's, and RFJ." Within the section "Release by Aztec and Ruano," Ruano expressly

agreed to:

> irrevocably and unconditionally release, acquit and forever discharge[ ] [Jose] Michel, FJO, Jalisciense's and RFJ, including their officers, shareholders, directors, employees, franchisees, franchisors, parent corporations, joint ventures, subsidiaries, administrators, agents, representatives, executors, successors, predecessors, heirs, trustees, attorneys and/or assigns from any and all claims, rights, interests, causes or action and/or remedies of any nature, kind or description whatsoever, past, present, pending or not pending, known or unknown, foreseen or unforeseen, latent or patent, acquired or unacquired, and all demands, damages, expenses, assessments, professional fees, losses, liabilities and actions, of every kind, nature and description, known or unknown, latent or observable, (collectively referred to as "Claims"), which relate in anyway to the Action; excluding the obligations under this Agreement.

{¶ 65} Within the settlement agreement, the parties also agreed to dismissal of the

Action as follows:

> In consideration of the promises and covenants contained herein, Aztec and Ruano authorize their attorneys to file a stipulation of partial dismissal, with prejudice, limited to those claims against FJO, Inc., under case number 2007 CVH 01091 with the Clermont County, Ohio Court of Common Pleas in the form attached hereto as [an] Exhibit. Likewise, FJO authorizes its attorneys to file a stipulation of dismissal of FJO's counter-claims with prejudice, under case number 2007 CVH 01091 with the Clermont County, Ohio Court of Common Pleas in the form attached hereto as [an] Exhibit.

The referenced "Exhibit" was the Notice of Partial Voluntary Dismissal, which was filed with

the trial court on January 24, 2008. The Notice of Partial Voluntary Dismissal dismissed with

prejudice Aztec and Ruano's claims against FJO as well as FJO's counterclaims against

Aztec and Ruano. The Notice of Partial Voluntary Dismissal specifically stated that

"[Ruano's] remaining claims against Defendants Octavio Duenas and Ramon Michel survive

- 29 -

this partial dismissal and remain unaffected by this partial dismissal of Plaintiffs' claims against Defendant FJO, Inc."

{¶ 66} Having reviewed the RFJ release, and being mindful that, where possible, we must construe the agreement to give effect to *every* provision in the agreement, we find that the RFJ release did not release Ruano's claims against Michel. At the time the settlement agreement was entered into Michel was not an officer or a shareholder of RFJ. Although Michel contends that the word "predecessor," as it is used in the section entitled "Release by Aztec and Ruano," refers to predecessor officers and shareholders, we find otherwise. The parties' use of the term "predecessor" refers to a predecessor entity or predecessor in interest to FJO, Jalisciense's, or RFJ. The term is not being used as an adjective to refer to previous officers and shareholders of FJO, Jalisciense's, or RFJ. Had the parties intended to include past officers and shareholders, they could have easily included a provision releasing "present and past officers, shareholders, directors, and employees" from liability. Further, it is apparent that the parties to the settlement agreement did not intend to release those claims they had against Michel personally as Michel was not a named party to the agreement or release and the agreement expressly limited dismissal of the Action to "those claims against FJO, Inc."

{¶ 67} Since Michel was not a direct party to the settlement agreement and the provision releasing claims against RFJ and its current shareholders and officers does not apply to him, the trial court did not err by refusing to apply the release to Ruano's claims against Michel for fraud and unjust enrichment.

{¶ 68} Michel's third assignment of error is therefore overruled.

{¶ 69} Assignment of Error No. 4:

{¶ 70} THE TRIAL COURT ERRED, TO THE DETRIMENT OF THE DEFENDANT[S]-APPELLANTS, BY DISMISSING THEIR COUNTERCLAIM FOR CONSTRUCTIVE TRUST AGAINST RICARDO RUANO AT THE CLOSE OF EVIDENCE.

{¶ 71} In their final assignment of error, Duenas and Michel contend that the trial court erred by granting Ruano's Civ.R. 41(B)(2) motion to dismiss their counterclaim for a constructive trust as the evidence presented at trial established that all the parties involved in the creation of Los Cabos knew that ownership in Aztec was "[Ruano] 20%, Duenas 30%, and the Michel brothers [RFJ] 50% even though Duenas possessed 100% of the stock." Duenas and Michel argue that pursuant to the parties' collective understanding, Ruano could not own 70 percent of the corporation until he purchased the "entire 50% share that initially belonged to the Michel brothers [RFJ]." Duenas and Michel assert that the establishment of a constructive trust is necessary to prevent Ruano from getting an "unjust windfall" of 70 percent of the corporation when Ruano only invested a total of $155,000 ($80,000 for the initial investment and $75,000 paid to Michel).

{¶ 72} Pursuant to Civ.R. 41(B)(2), "[a]fter the plaintiff, in an action tried by the court without a jury, has completed the presentation of the plaintiff's evidence, the defendant * * * may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff * * *." Accordingly, "the trial judge, as the trier of fact * * * weighs the evidence and actually determines whether the plaintiff has proven the necessary facts by the appropriate evidentiary standard." *Webb v. C & J Properties, L.L.C.*, 12th Dist. No. CA2010-01-016, 2010-Ohio-3818, ¶ 13, citing *Tillman v. Watson*, 2d Dist. No. 06-CA-10, 2007-Ohio-2429, ¶ 11.

{¶ 73} A trial court's ruling on a Civ.R. 41(B)(2) motion will be set aside on appeal "only if erroneous as a matter of law or against the manifest weight of the evidence." *Webb*

at ¶ 13. As we previously stated, when considering whether a judgment is against the manifest weight of the evidence, "we weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the finder of fact 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Marinich*, 2012-Ohio-4526 at ¶ 20, quoting *Eastley,* 2012-Ohio-2179 at ¶ 20.

{¶ 74} The Supreme Court has defined a "constructive trust" as

> [a] trust by operation of law which arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.

*Estate of Cowling v. Estate of Cowling*, 109 Ohio St.3d 276, 2006-Ohio-2418, ¶ 18, citing *Ferguson v. Owens*, 9 Ohio St.3d 223, 225 (1984). A constructive trust is an equitable remedy that protects against unjust enrichment in situations where property has been obtained by fraud or in situations where it is against the principles of equity that the property be retained by a certain person even though the property was acquired without fraud. *Ferguson* at 226.

{¶ 75} "In order to recover on a claim of unjust enrichment, the party asserting the claim must demonstrate: (1) a benefit conferred by a plaintiff upon a defendant, (2) knowledge by defendant of the benefit, and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. *Fewell v. Gross*, 12th Dist. Nos. CA2006-04-096, CA2006-05-103, 2007-Ohio-5788, ¶ 13, citing *Hambleton v. R.G. Barry Corp*, 12 Ohio St.3d 179, 183 (1984). Furthermore, "before a constructive trust can be imposed, there must be adequate tracing from the time of the wrongful deprivation of

the relevant assets to the specific property over which the constructive trust should be placed." *Estate of Cowling* at ¶ 22.

{¶ 76} The party asserting the existence of a constructive trust must prove its existence by clear and convincing evidence. *Id.* at ¶ 20. Clear and convincing evidence means that degree of proof that will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established. *Fewell* at ¶ 14.

{¶ 77} After reviewing the record, weighing the evidence, and considering the credibility of the witnesses, we find that the trial court did not err in granting Ruano's motion to dismiss Duenas and Michel's claim for a constructive trust. Although Duenas and Michel sought a ruling that Ruano holds 25% of the corporation's shares in constructive trust for Ramon Michel, they failed to demonstrate a benefit conferred by Michel to Ruano. At the time Ruano became 70 percent owner of Aztec, Duenas, in exchange for forgiveness of the $70,000 promissory note, conferred the benefit to Ruano. The shares Ruano owns in Aztec cannot be traced to Michel as Michel never legally owned stock in Aztec. Duenas retained full ownership of 100 shares of stock until April 2006, when 70 shares were assigned to Ruano.

{¶ 78} Furthermore, Duenas and Michel failed to demonstrate by clear and convincing evidence that Michel, in his individual capacity, used personal funds to invest in Los Cabos, and that such an investment should be represented by stock ownership. Rather, the evidence presented at trial demonstrated that RFJ, a legal entity comprised of more individuals than just Michel, used its assets to obtain equipment for Los Cabos. While RFJ may have a claim against Aztec for the equipment it placed in Los Cabos, Michel, in his individual capacity, does not have an equitable interest. As we have previously mentioned, there is no evidence that Michel, in an individual capacity, contributed the equipment or other assets utilized by Los Cabos. Rather, the evidence presented at trial, including Michel's own

testimony, indicates RFJ purchased the equipment for Los Cabos. Michel's involvement in helping to get Los Cabos underway occurred through his participation in RFJ, for which he was compensated for directly by RFJ.

{¶ 79} For the foregoing reasons, we find that the trial court's decision to dismiss Duenas and Michel's claim for the establishment of a constructive trust was neither erroneous as a matter of law nor against the manifest weight of the evidence. Accordingly, Duenas and Michel's fourth assignment of error is overruled.

## IV. CONCLUSION

{¶ 80} Having found Duenas and Michel's assignments of error to be without merit, we hereby affirm the judgment of the trial court.

{¶ 81} Judgment affirmed.

S. POWELL, P.J., concurs.

PIPER, J., dissents.

**PIPER, J., dissenting.**

{¶ 82} None of the elements of fraud are established within the record, thus I respectfully dissent from the majority opinion. There is an insufficiency of evidence to support the allegation that Michel committed fraud against Ruano.

{¶ 83} As the majority referenced, the disjointed nature of this litigation has spanned several years, adding to its complexity. The various issues in the case have been presided over by multiple judges. Therefore, the decisions set forth by the various judges have not been the result of any one cohesive legal proceeding. Even so, we are left with the task of reviewing the trial court's decision that Ruano proved his fraud claim by a preponderance of the evidence.

**{¶ 84}** The facts are undisputed that the parties never memorialized in contract any of their agreements. They operated outside the parameters of customary business dealing with terms and conditions being formed, and re-formed, in a series of conversations. The parties had several meetings in basements, over the phone, and through the means attributed to familial informalities and trust.[17] Because both parties to some extend base their claims and defenses on their memory of conversations, the few objective facts we have become more significant.

**{¶ 85}** While I am in no way espousing that fraud can only exist in conjunction with a written contract, the facts of this specific case indicate that the parties operated with remarkable informality and without any specific knowledge or representations regarding the kitchen equipment. Ruano was told that the restaurant would have equipment, and Michel proceeded to obtain the equipment by the same means he employed when opening prior restaurants. Despite Ruano's forced interpretation of the circumstances, there is no evidence to suggest that Ruano expected Michel to perform differently than he had when starting up other new restaurants. Given the patently-informal manner in which the parties "negotiated" their expectations and loosely proceeded in their dealings, it simply cannot be said that Ruano proved the factors necessary to substantiate a fraud claim.

**{¶ 86}** According to the Ohio Supreme Court,

> Common-law fraud requires proof of the following elements: "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury

---

17. In fact, and as referenced by the majority, the trial court stated in its decision on summary judgment, "speaking bluntly, it is clear that *none of the parties* involved in the formation of Aztec and its operation as Los Cabos *had any firm idea what they were doing.* None displayed any effort to comply with the formalities required of corporate entities, and instead, apparently relied upon a series of informal transactions and agreements. *This course of action has ultimately placed them knee-deep in litigation.*" (Emphasis added.)

proximately caused by the reliance.

*State ex rel. Illum. Co. v. Cuyahoga Cty. Court of Common Pleas*, 97 Ohio St.3d 69, 2002-Ohio-5312, ¶ 24.

## I. A Representation of How the Equipment Would be Procured

{¶ 87} First, Ruano had the burden to prove that Michel made a specific representation regarding how the kitchen equipment would be procured. The majority contends that Ruano proved this element because Michel testified that he told Ruano that he had paid for the equipment, when in actuality a company Michel had control of, RFJ, had paid for the equipment through the use of a rebate program. The record is undisputed that Michel was the president of RFJ and that he had on numerous occasions used the rebate program to open restaurants.[18] The credit used to pay for the Los Cabos equipment was earned through past purchases and payments made by Michel through his corporation, and the credits were his corporation's to use. Thus, it is understandable that Michel considered the rebate credits as "his." There was no specific representation as to whether Michel would secure the equipment with business or personal resources; it was represented that the equipment would be paid for at no additional cost to Ruano, and it was.

{¶ 88} Ruano argues that Michel had no real investment in the restaurant because he did not personally pay for the equipment. However, Michel invested his experience in opening restaurants, his concepts from previous openings, his menus, his training of staff, negotiations with the landlord to remodel the future restaurant sight, all of which were comprised of hours, days, and weeks of Michel's time. Michel's contributions were given little importance by the majority, and summarily discounted based upon the $10,000 payment

---

18. Michel testified that he was president of several corporations, all that used the rebate program, and that he acted as a personal guarantee with US Foods.

credited to Michel.[19] Moreover, Ruano conceded in his testimony Michel personally paid him on a reoccurring basis during the initial set-up phase so that Ruano would be able to support his family until the restaurant was up and running. Therefore, this $10,000 figure is grossly insufficient consideration for Michel's efforts because Michel was also paying Ruano.[20]

{¶ 89} Regardless, it is unreasonable to conclude that the very limited compensation Michel initially received would adequately reimburse Michel for his experience and start-up contribution during the opening of the restaurant. Beyond the extensive experience he brought, Michel also left his businesses in Indianapolis to concentrate on the opening of Los Cabos, spending a large majority of time in Ohio during the opening process. During this time, Michel negotiated with several entities to ensure that the restaurant had the proper plumbing, was built-out properly, and was up to code standards. Moreover, Michel also oversaw the construction, and Ruano agreed during his testimony that Michel "participated actively and personally" during the construction.[21]

{¶ 90} The majority appears to question whether or not Michel "legitimately" believed he was entitled to compensation for his efforts because he "never submitted an invoice" for his services. Yet, this is really just one example of the type of deviations the parties deployed in their mutual avoidance of customary business practices.

## II. Materiality

{¶ 91} Second, Ruano had the burden to prove that Michel's alleged representations

---

19. Michel testified that whenever he set up a new restaurant, he would receive $10,000 to help compensate for leaving his wife and children and spend months at the new location. Also, Michel testified that he would use the money to help open the restaurant, and that often times, he expended more than the $10,000 he was given for that purpose.

20. Michel testified that he paid Ruano $500 a week for 20 weeks. Moreover, Michel further explained that the $10,000 was never issued in a check, but rather, was credited toward his overall investment.

21. Before the build-out and construction, the building had been a Blockbuster Video store, and several extra steps were necessary to convert the building into one proper for food preparation and service, such as the installation of grease traps, a hood system to regulate the air flow, sprinkler systems, and construction of a bar, all of which Michel oversaw.

regarding the source of funds to be used for securing the equipment were material to the transaction at hand. The majority contends that Ruano proved this element because Ruano "cared" about who paid for the equipment and wanted to reimburse the appropriate party. Also, the majority cites the fact that Ruano withheld the remaining $50,000 payment to Michel as proof that the representation was material. However, the record simply does not support the majority's analysis.

**{¶ 92}** During his direct testimony, Ruano confirmed that he did not find out that RFJ had used its credits for procuring the equipment until after he sued Michel. Ruano's counsel posed the following question, "* * * during the course of this litigation, did you eventually find out that RFJ was actually the one that contributed the equipment?" Ruano answered "that's correct." Therefore, Ruano had to have withheld his $50,000 payment for a different reason since he had initiated suit before he knew that Michel's corporation , RFJ, provided the equipment.[22]

**{¶ 93}** Nor does the record indicate that Ruano "cared" enough about how the equipment was paid for to ever question Michel during the initial set up phase of the restaurant. The majority unpersuasively writes that the source of the funds for providing the equipment was material, yet, amazingly, Ruano himself testified that he did not have any knowledge as to how the equipment was being procured.

> [Q]  Mr. Ruano, isn't it true that Ramon Michel never told you
> how he was making his investment into Los Cabos?

---

22. There are many incidents of inconsistencies that remain unresolved in Ruano's testimony. For example, while Ruano very clearly indicates that he did not find out about RFJ using its credits to purchase the equipment until *after* the litigation started, he testified that he had previously decided to not pay the second payment of $50,000 (which occurred before the litigation began) because Michel did not pay for the equipment personally. Ruano's post-litigation explanation makes no sense. It is impossible to pick-and-choose which pieces of Ruano's inconsistent testimony to rely upon. It is clear that Ruano gave testimony under oath that he, himself, later contradicts. Such testimony would customarily be rejected as sufficient to support the burden of proof in a fraud claim. It is incumbent upon an appellate court to evaluate the evidence, and where the circumstances require, assess the credibility of the witnesses if appellate review is to be meaningful. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562 (1969).

[A] He said he was paying for it.

[Q] Well, I know he said – you said he said he was paying for it, but he didn't tell you how he was doing it, right?

[A] Right.

[Q] Didn't tell you, for example, if he was using stock; didn't tell you he was selling a condo, correct?

[A] That's correct.

[Q] And he never told you he was only using his direct personal funds out of his own checking account, correct?

[A] I understood he was paying for it; *how – what way, I don't know.*

[Q] Yeah. You may have understood that he was paying for it, but he didn't tell you and you didn't ask whether he was using his direct personal funds or using same other asset he had, correct?

[A] Correct

(Emphasis added.) If how Michel was paying for the equipment was so important to Ruano, one would logically have to ask why Ruano took no initiative nor conducted any follow-up to insure that the equipment was being procured or paid for in a particular manner. The source of Michel's ability to procure the equipment was never discussed until *after* Ruano filed suit against Michel.[23]

{¶ 94} Nor does the record indicate that Ruano relied on any representations made by Michel given the time frame set forth in the majority as "in or about May 2006." Even if I were to limit my analysis to 2006, when the parties discussed the sale of Michel's stock, there is no indication in the record that Ruano predicated the transfer of stock on how the equipment was procured, or paid for, by Michel. Although it was later confirmed that Michel did not use his personal funds to pay for the equipment, there is no indication that how the equipment

---

23. Even the trial court acknowledged that Ruano's allegations of fraud "morphed" as matters progressed.

was paid for back in 2003 was material in the 2006 transaction. During Ruano's cross-examination, the following exchange occurred.

> [Q] All right. So in other words that entire $125,000 – that 125 that you had agreed to pay Ramon [Michel] – you would have followed through and paid simply by discovering that Ramon [Michel] had not put RFJ equipment in the restaurant, correct? Correct?
>
> [A] I don't know that. I don't know what my decision would have been back then.

If Ruano's reliance was specific to who paid the invoices personally, what other reason would he have to not pay if Michel had actually paid for the equipment out of his own pocket? There is no doubt that Ruano felt taken advantage of by the transaction, but even he admits that he did not know if he would have paid Michel in full even if Michel had paid for the equipment personally. The credits used by Michel, to his understanding, were his to use, if not with this venture, then in another venture. Feeling taken advantage of in a familial and informal transaction that lacked any controlling contracts is legally insufficient to support the requisite elements of a fraud claim.[24]

### III. Knowledge of Falsity

{¶ 95} Third, Ruano had the burden to prove that Michel made his representation falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred. The majority indicates that Ruano proved this element because Michel had knowledge that he used RFJ's credits to pay for the equipment, yet made representations that he had paid for the equipment. However, the record is clear that at all times, Michel refers to RFJ as his company, and never distinguished

---

24. Michel likely also feels taken advantage of when Ruano, as a result of litigation, has 70% control of the business venture (excluding Michel entirely) despite Michel spear-heading the start-up of the business, which had an indicated value of $500,000 (although the trial court excluded evidence of Ruano skimming from the gross proceeds).

between the corporation and himself "personally." To Michel, RFJ was him, "personally," and he never wavered in expressing that belief. The record is clear that Michel paid for the equipment using the rebate system in the exact same manner that he had used in the past to set up other restaurants, and therefore reasonably believed that he had, in fact, paid for the equipment personally. In other words, by using the credits in this transaction, Michel cannot use the credits elsewhere. Thus, by losing the credits, Michel has "paid" for their use.

{¶ 96} Ruano was well-aware of the fact that Michel had experience in opening restaurants, and was also aware of the fact that Michel's brothers (the other shareholders of RFJ) were interested in opening Los Cabos.[25] In fact, Ruano was at an early meeting where the other Michel brothers were in attendance. Ruano confirmed at trial that he was "expecting that the equipment of $100,000 worth [sic] were going to come from the Los Michels – the brothers." Although the other two brothers ultimately decided not to pursue personal involvement in Los Cabos, there is absolutely no indication in the record that Michel did not proceed with an absolute authority to use the rebate program.[26] During his direct testimony, Michel testified that both of his brothers knew that he was using the RFJ rebate credit to pay for the Los Cabos equipment, and that neither of his brothers objected to the practice. There is an absence in the record of any testimony to the contrary. Nor is there any suggestion in the record that either brother has ever made a claim, or threatened to make a claim, against Los Cabos or Ruano regarding use of the rebate program.[27]

{¶ 97} Again, there is no evidence that Michel made any representations with

---

25. Ruano testified that he agreed to lessen his share in the restaurant from the original 33% figure (subsequently giving Michel a 50% share) because the Michel brothers had "a track record of successful restaurants * * *."

26. Ruano admitted on cross-examination that he had "no knowledge" of what arrangements Michel made with his brothers about using RFJ rebate system to install the Los Cabos equipment.

27. In fact, if Fransisco and Jose pursued a claim for improper use of RFJ's rebate credits, it would be against Michel, as he was the only person who had apparent authorization to use the rebate program.

knowledge of their falsity, as he paid for the equipment using rebates he had professionally earned previously and had authority to use. At all times, Michel expressed an unsophisticated, but reasonable, belief that his corporation's investments were his own. In regard to Michel's belief that the rebates were "his" because the company was "his," I am mindful that the trial court found it noteworthy that the parties were unsophisticated with business formalities. Furthermore, during Michel's testimony, he explained, "my company – I was the owner of the company. So it can be the company or personally. It was my investment, RFJ, Cancun, Inc., and Calesienso was [sic] my companies. I was part of the company, and this is how we did the investment." There is no evidence in the record to contradict Michel's testimony that his company paid for the equipment in full, as it had done in the past.[28]

## IV. Fraudulent Intent

{¶ 98} Fourth, Ruano had to prove that Michel made his representation with the intent of misleading Ruano into relying upon it. The majority contends that Ruano proved this element based on the fact that Michel was not the sole shareholder of RFJ and therefore could not lay sole claim to the assets of RFJ. Also, the majority contends that Michel did not personally contribute his money or asserts to the creation of Los Cabos and earned $10,000 from RFJ to work for Los Cabos. However, the record indicates, and the majority does not disagree, that Michel *legitimately believed* that he contributed the kitchen equipment to Los Cabos based upon his paying the invoices using the rebate credits he had previously earned. The invoices for equipment and food are clearly billed to RFJ, and it is incredulous to contend that Michel had an intent to mislead when he made no effort to hide the fact that RFJ was

---

28. One might take great effort to discuss the legal workings of corporate structure, terminology, and the governing law. However, there is no evidence Michel, or Ruano for that matter, had knowledge of any such formalities. In fact, the trial court noted the evidence was to the contrary. With the evidence at hand, we cannot discount Michel's layman belief that he stood in the shoes of the corporation, especially given that fraud is greatly determined by one's knowledge and intent.

paying the invoices.

{¶ 99} As stated by the majority, intent must be inferred from the *totality* of the circumstances. Here, the circumstances are such that Ruano made no effort to involve himself in the early stages of the opening of the restaurant and the procurement of the kitchen equipment. Instead, he was told that Michel would take care of procuring the equipment, that the kitchen equipment would be in the restaurant at opening, and that it would be paid for. That is exactly what occurred. There is no indication at all that Michel took any steps to hide his corporation's involvement, or that he tried to conceal any details regarding the use of the rebate program. Even after the litigation commenced, Ruano's testimony indicates that he still does not have a full understanding as to how the rebate program works. *There is no evidence to fairly suggest Michel made any representations with the intent of misleading Runao into relying upon it in order to conceal a fraud.*

{¶ 100} The circumstances render it impossible for Ruano to prove that Michel had an intent to mislead Ruano into reliance at the time Ruano agreed to purchase Michel's interest for $125,000. As previously discussed, the record is clear that at all times, Michel refers to RFJ as "his" company, and never distinguished between the corporation and him "personally." Michel did not represent that he was anything but RFJ to Ruano, and he has remained steadfast in his assertion that there was no difference between him paying for the equipment from RFJ rebates, or from his own pocket. While this distinction may have had little significance in the face of a legally-binding contract, there is no indication that the difference between RFJ and Michel was a misrepresentation born of Michel's intent to mislead Ruano.

## V. Justifiable Reliance

{¶ 101} Fifth, Ruano must prove that he justifiably relied upon Michel's representation. The majority contends that Ruano proved this element because Ruano had no apparent

reason to doubt the veracity of Michel's representations of his intent to purchase the kitchen equipment, especially given Ruano's lack of experience in opening a restaurant. Yet, there is no testimony that Michel ever stated he would procure the equipment with personal funds

{¶ 102} Significantly, as the majority itself established, the focus is not on the time that Ruano opened the restaurant, but rather, the time frame of 2006 when the parties agreed to negotiate the sale of Michel's shares. At that time, Ruano had been manager of the restaurant for approximately three years, and the restaurant had been in his actual possession for several months. Ruano admitted that he had unfettered access to the records (including the invoices billing RFJ) and that he gave no attention or significance to such matters. Perhaps Ruano's blind reliance on Michel's statements may have been excusable in 2003 at the restaurant's inception, but it was not excusable after Ruano had been managing the restaurant and was about to become the majority owner.[29]

{¶ 103} The majority's contention appears disingenuous that it was "not unreasonable" for Ruano to agree to purchase Michel's stock without first verifying that Michel personally paid for the kitchen equipment, particularly if Runao had been relying on such as a material representation. The majority states that how the equipment was paid for is a material fact, and one that Ruano relied heavily upon. How can it be said, then, that Ruano had no responsibility, (nor even an inclination), to verify the facts underlying what the majority claims was such a material fact, and one that supposedly led to Ruano's detrimental reliance? In fact, Ruano testified that he began looking through the paperwork associated with the restaurant *after* he had already agreed to purchase Michel's ownership interest because "if I'm going to take possession of something I need to know everything that's going on –

---

29. While Ruano did not take the initiative to review invoices or any other paperwork regarding the start-up, he "would browse occasionally the financial statements * * *." Ruano browsing the financial statements demonstrates that he cared about the profits of the restaurant, and that he had access to the records. However, Ruano never bothered to look at the paperwork regarding the initial phases of opening the restaurant because it obviously was not a "material" matter to be relied upon.

everything." However, Ruano waited until after he had already agreed to purchase Michel's interest, and after he made the first payment of $75,000, to clarify any information regarding the start-up or what amounts the parties contributed. If Ruano was so concerned with "buying the equipment 'appropriately' and 'paying off' the party who had invested in the equipment" as the majority contends, then one would reasonably assume that Ruano would first verify who paid the invoices, particularly when he knew he, himself, had not paid them.

{¶ 104} Despite evidence to the contrary, the majority contends that the "books" do not clarify how payment was made to U.S. Foodservice or who specifically paid the equipment bill. Yet, the invoices very clearly indicate the party billed was RFJ, and that the invoices were directed to the attention of Michel. While the majority pays little heed to this fact, there is no indication in the record that Michel tried to hide the fact that RFJ was the entity being billed, and paying, the invoices. If Michel were truly intending to hide the fact that RFJ was paying the bills, one wonders why he took absolutely no steps to conceal the fact from the very person he is accused of defrauding.

## VI. Resulting Injury

{¶ 105} Lastly, Ruano had to prove a resulting injury to himself that was proximately caused by the reliance on Michel's statement. The majority essentially contends that this element is proven because *Michel* received $75,000 that he was not entitled to.[30] However, the majority does not explain how *Ruano*, himself, was injured. The majority notes the fact that no other entity had made a claim against Ruano or Los Cabos for the kitchen equipment. The record is patently clear, and it is undisputed, that the equipment has been paid in full by Michel's corporation and yet Ruano continues to use it in his restaurant.

{¶ 106} Even if I were to disregard the value of kitchen equipment that Michel's

---

30. Yet, Michel lost all his interest in the restaurant as a result of proceedings in earlier stages of the current litigation.

corporation paid for, we are still left with the fact that Michel played a great role in opening Los Cabos, one that far exceeds the $10,000 "income" the majority references as being paid to Michel by RFJ. Through his own testimony, Ruano admits that he was not experienced enough to open a restaurant on his own, and that he needed the help and guidance of Michel, who had opened several successful restaurants. For this reason, Michel, and not Ruano, scouted possible locations, researched various areas, negotiated with possible landlords, was able to get one landlord to agree to perform $89,640.32 in improvements to the restaurant sight, bring in the concept for the restaurant, bring in menus from his other restaurants, bring his staff to train the Los Cabos staff, and allow Ruano the time to learn how to manage the restaurant.[31]

{¶ 107} Most certainly, Ruano was not damaged by paying Michel for Michel's share in the company. Michel had a stake in the company, as did Duenas. Michel agreed to sell his share in the company, which presumably also included the kitchen equipment, to Ruano for $125,000. Ruano agreed, and paid Michel a partial payment of $75,000. The first trial court determined that Ruano's ownership interest was 70%, even though the trial court had knowledge that Ruano had not make the subsequent $50,000 payment, effectively denying Michel the other $50,000 Ruano agreed to pay. Cleary, the trial court, at that state of the proceedings, discounted Michel's share because the kitchen equipment was paid through RFJ's rebate program. Despite the trial court reducing Michel's share, Michel still contributed *his* extensive knowledge, *his* prior experience opening restaurants, *his* recipes, *his* skills, *his* menus, *his* training staff, and *his* sweat equity. Michel's share in the restaurant

---

31. The majority states that the menus were specific to RFJ, but Michel testified that he had been in business for 18 years, and had developed the menus on his own, had a copyright on them, and used them through RFJ in other restaurants.

had value that far exceeded the referenced $10,000. In the end, Ruano received a share he agreed was worth $125,000 (including the kitchen equipment free and clear) for only $75,000. It is beyond any reasoning to subsequently say that Ruano was injured in any way by Michel.[32]

{¶ 108} Whether the restaurant is valued at $500,000 as the parties contend, or it is valued less than that, the fact remains that Ruano is now a 70% owner of a successful and valuable business. If Michel is forced to return the $75,000 payment, as the majority condones, Ruano will have obtained Michel's 50% ownership share at no cost (not to mention Ruano receiving additional windfall of punitive damages in the amount of $36,500, attorney fees in the amount of $99,918, and court costs of $22,573.95). When considering the conduct of the parties and the evidence in context, this judgment serves as a grave injustice upon Michel.

{¶ 109} This case is a classic example of how important it is for business partners to understand fully their own rights and responsibilities and the importance of memorializing in contract any factors that caused reliance. Instead, three men with little or no legal knowledge trusted in their familial bond, and proceeded without any specific expectations, save that Michel would own 50 percent of the restaurant, Duenas would own 30 percent, and Ruano would own 20. There is no evidence in the record that Michel made any specific representations regarding the kitchen equipment, outside a general representation that he would procure the equipment, which he did in fact do. There is no indication in the record that where the equipment came from or how it got into the restaurant was a material issue, or that Ruano relied on Michel personally paying for the equipment.

---

32. The majority misguidedly contends that the injury element of fraud is satisfied because Ruano paid $75,000 for the controlling interest of a profitable business. However, paying $75,000 for a controlling interest of a profitable business cannot reasonably be inferred as being "defrauded out of $75,000" as the majority suggests.

Nor is there any evidence that Ruano has been damaged in the least.

{¶ 110} Each element of a fraud claim must be proven by a preponderance of the evidence, and the lack of any one element is fatal to that claim. The conduct of the parties created much confusion, which also invades the circumstances surrounding the other issues on appeal. However, I find it unnecessary to address the other assignments of error because no fraud can be established with the facts before us. Ruano has not proved any of the elements of fraud by a preponderance of the evidence, and therefore, I dissent from the majority's resolution of Michel's second assignment of error.